892 F.2d 1328
 58 USLW 2432, Fed. Sec. L. Rep. P 94,850
 Norman J. ACKERBERG, Appellee,
v.
Clark E. JOHNSON, Jr., Roger G. Lindquist, Gary M. Petrucci,
R. Hunt Greene, Piper, Jaffray & Hopwood, Inc.,
Appellants.
Norman J. ACKERBERG, Appellee,
v.
Clark E. JOHNSON, Jr., Appellant.
Roger G. Lindquist, Gary M. Petrucci, R. Hunt Greene, Piper,
Jaffray & Hopwood, Inc.
Norman J. ACKERBERG, Appellant,
v.
Clark E. JOHNSON, Jr.; Roger G. Lindquist; Gary M.
Petrucci; R. Hunt Greene; and Piper, Jaffray &
Hopwood, Inc., Appellees.
 Nos. 88-5538, 88-5539 and 89-5093.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 12, 1989.
Decided Dec. 28, 1989.
 
 W. Michael Drake, Minneapolis, Minn., for Lindquist.
 Curtis D. Forslund, Minneapolis, Minn., for Johnson.
 Floyd E. Siefferman, Jr., Minneapolis, Minn., for Ackerberg.
 Before FAGG and BEAM, Circuit Judges, and HENLEY, Senior Circuit Judge.
 BEAM, Circuit Judge.
 
 
 1
 This appeal arises out of the sale of 16,500 unregistered shares of Vertimag Systems Corporation stock for $99,000. Norman J. Ackerberg brought suit against Piper, Jaffray & Hopwood and several of its employees (the PJH defendants), as well as against Clark E. Johnson, Jr., the chairman of the board of Vertimag, from whom Ackerberg bought most of his shares. The complaint set forth nine counts, alleging violations of the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa (1988), the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a-78kk (1988), the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 (1982) and various state securities laws. While many of these claims were ordered to arbitration and others dismissed, the district court refused to compel arbitration of the 1933 Act claims, and entered summary judgment in part of them in Ackerberg's favor. All defendants appeal from the order of summary judgment, and Ackerberg cross-appeals from the district court's calculation of damages. We reverse.
 
 I. BACKGROUND
 
 2
 Ackerberg bought the Vertimag shares in March of 1984. Ackerberg bought 12,500 shares from Johnson, who, in addition to being the chairman of the board, was one of the founders of Vertimag and its largest individual stockholder. Ackerberg bought the remaining 4,000 shares from Roger Lindquist, a vice president at Piper, Jaffray & Hopwood, and the owner of at least 50,000 shares of Vertimag. Lindquist's shares were held by the Roger Lindquist Partnership, an entity organized to invest in Vertimag and in other securities. Lindquist's partners were Gary Petrucci, a senior vice president at PJH who handled Ackerberg's account, and James Vieberg, another registered representative at PJH. Ackerberg paid $6.00 per share for 16,500 shares, and paid PJH a commission of $2,062.
 
 
 3
 The Vertimag transaction began in October of 1983, when Vertimag proposed a private placement of $10,000,000 in securities, to be sold at $6.00 to $6.50 per share. In December of 1983, Ackerberg said that if he could invest around $100,000, he would be interested. Petrucci then gave Ackerberg a ninety-nine page private placement memorandum which contained detailed information about Vertimag.
 
 
 4
 On March 17, 1984, Ackerberg signed a subscription agreement, prepared by counsel for Vertimag. Ackerberg testified by deposition that he read and understood this document. Vertimag's counsel stressed to Ackerberg that no sale could be made without the subscription agreement, which agreement informed Ackerberg that the Vertimag securities were unregistered and not readily transferable. Specifically, the agreement provided, in part, that:
 
 
 5
 2. The undersigned acknowledges and represents as follows:
 
 
 6
 * * *
 
 
 7
 * * *
 
 
 8
 (e) That the undersigned has been given access to full and complete information regarding Vertimag....
 
 
 9
 * * *
 
 
 10
 * * *
 
 
 11
 (g) That ... the Shares have not been registered under the Securities Act of 1933 and, therefore, cannot be sold unless they are subsequently registered under said Act or an exemption from such registration is available, (iii) there is presently no public market for the Securities and the undersigned may not be able to liquidate the investment ... and (iv) the transferability of the Securities is restricted....
 
 
 12
 3. The undersigned has been advised that the Securities are not being registered under the Securities Act of 1933 or the relevant state Securities laws and are being sold pursuant to exemptions from such Act and laws; and that your reliance upon such exemptions is predicted [sic] in part on the undersigned's representations to you as contained herein.
 
 
 13
 Ackerberg also represented in the subscription agreement that his yearly income was in excess of $200,000, that his net worth was over $1,000,000, and that his liquid assets exceeded $500,000. Indeed, Ackerberg's account at PJH alone totaled around $500,000.
 
 
 14
 Ackerberg began this litigation in March of 1985. As indicated, Ackerberg's complaint contained nine counts against Johnson, PJH, and its employees Lindquist, Petrucci, and R. Hunt Greene, who was also involved in the sale of Vertimag to Ackerberg. Count one was based on § 12(1), count two on § 12(2), and count three on § 17(a) of the 1933 Act. Count four was based on § 10(b) of the Act of 1934. Counts five through eight were based on common law fraud, breach of contract, and violation of the Minnesota Blue Sky laws. Count nine alleged RICO violations. The third count was dismissed by the district court on June 11, 1985, and the sixth count dismissed as to Johnson on March 14, 1986. In the order of March 14, 1986, the district court also refused to dismiss the 1933 Act claims against Johnson, finding that Johnson had not proven entitlement to an exemption from registration under the Act. Counts four through nine against the PJH defendants were ordered to arbitration, leaving only the 1933 Act claims as to them.
 
 
 15
 On August 23, 1988, the district court entered summary judgment in favor of Ackerberg on the § 12(1) claim and refused to compel arbitration of either remaining 1933 Act claim. Johnson's motion for summary judgment on all claims remaining against him was denied. The district court denied the motions of defendants for reconsideration on November 4, 1988.
 
 
 16
 The district court's order of November 4, 1988, entered pursuant to Ackerberg's motion under Rule 54(b) of the Federal Rules of Civil Procedure, was a final judgment as to Count I of the amended complaint. Rule 54(b) allows the entry of a final judgment "as to one or more but fewer than all of the claims or parties" in a case involving multiple claims and multiple parties. The court's entry of judgment on Ackerberg's § 12(1) claim leaves pending the § 12(2) claim against Johnson and the PJH defendants, as well as claims four, five, seven, eight and nine against Johnson. The district court could enter a final judgment pursuant to Rule 54(b) only by determining that "there is no just reason for delay" within the meaning of the Rule. The court stated in its order of November 4, 1988, that a final judgment under Rule 54(b) was appropriate because "plaintiff's counsel has represented that by the entry of such judgment, this matter may be effectively terminated, and because there is no just reason for delay in the entry of an order for judgment." Order, Civ. No. 4-87-159, Nov. 4, 1988, at 7.
 
 
 17
 On January 10, 1989, the district court calculated damages on the § 12(1) claim by using a rescissionary formula which awarded Ackerberg the difference between the $6.00 per share he paid and $2.75 per share, the amount contemplated in a private placement proposed for May of 1984. Ackerberg was thus awarded damages of $14,932.70 against the PJH defendants, and $46,716.07 against Johnson. The district court denied Ackerberg's motion to amend the judgment.
 
 
 18
 The PJH defendants and Johnson appeal from the order of November 4, 1988, which order denied reconsideration of the final judgment entered, and from the court's order refusing to compel arbitration of the 1933 Securities Act claims. On cross-appeal, Ackerberg appeals from the order denying his motion to recalculate damages.
 
 II. DISCUSSION
 A. Arbitration of 1933 Act claims
 
 19
 We begin with the order holding that Ackerberg's 1933 Act claims were not arbitrable under Wilko v. Swan, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953). The PJH defendants argued to the district court that Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987), which held that claims arising under the Act of 1934 are arbitrable, should also apply to claims arising under the 1933 Act. Defendants argued that McMahon effectively overruled Wilko, since the Court's rationale could be applied to 1933 Act claims as well as to 1934 Act claims. Indeed, after McMahon, many courts did find that 1933 Act claims were arbitrable for that reason. See Rodriguez De Quijas v. Shearson/American Express, Inc., --- U.S. ----, 109 S.Ct. 1917, 1923 n. 1, 104 L.Ed.2d 526 (1989) (Stevens, J., dissenting). See also McMahon, 482 U.S. at 243, 107 S.Ct. at 2346 (Blackmun, J., dissenting) ("In today's decision, however, the Court effectively overrules Wilko by accepting the Securities and Exchange Commission's newly adopted position that arbitration procedures in the securities industry and the Commission's oversight of the self-regulatory organizations (SROs) have improved greatly since Wilko was decided."). The district court in this case, however, agreed with the Second Circuit that "the [Supreme] Court ... did not overrule [Wilko ] and it continues to govern us." Order, Civ. No. 4-87-159, Aug. 23, 1988, at 7 (quoting Chang v. Lin, 824 F.2d 219, 222 (2d Cir.1987)). Thus, the district court refused to compel arbitration of the 1933 Act claims.
 
 
 20
 While, at the time, the district court was correct in declining to find that Wilko had been tacitly overruled, it is now clear that Wilko is no longer the law. In Rodriguez De Quijas, the Court noted that Wilko was based largely on a distrust of arbitration, and that such distrust is inconsistent with a clear congressional policy favoring arbitration. Wilko, the Supreme Court found, was "out of step with our current strong endorsement of the federal statutes favoring this method of resolving disputes." Rodriguez De Quijas, 109 S.Ct. at 1920. Thus, the Court concluded that "Wilko was incorrectly decided and is inconsistent with the prevailing uniform construction of other federal statutes governing arbitration agreements in the setting of business transactions." Id. at 1922. From Rodriguez De Quijas, then, it is clear that Ackerberg's 1933 Act claims are arbitrable.
 
 
 21
 Nevertheless, Ackerberg makes two arguments in support of the proposition that the district court's refusal to compel arbitration should not be reversed: (1) that the district court relied not only on Wilko, but also found in the alternative that the PJH defendants had waived their right to arbitration of the 1933 Act claims; and (2) that Volt Information Sciences, Inc. v. Board of Trustees, --- U.S. ----, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989) holds that an agreement specifying that state law governs the arbitrability of claims must be given effect, that the arbitration agreement between Ackerberg and Johnson provides that Minnesota law should govern arbitration, and that in this case, Minnesota law provides that 1933 Act claims are not arbitrable. We find neither argument persuasive.
 
 
 22
 First, Ackerberg argues that the district court was correct in finding that the PJH defendants waived their right to arbitration of the 1933 Act claims. By participating in discovery and especially by filing a motion for summary judgment on the 1933 Act claims, the PJH defendants took action inconsistent with their right to arbitration. The district court apparently credited this argument, for it held that:
 
 
 23
 Even if the law supported sending plaintiff's Securities Act claims to arbitration, the Court would deny defendants' motion because defendants have waived their purported right to arbitration by invoking the judicial machinery to this extent, and because arbitration of the Securities Act claims would not significantly advance the interests of judicial economy.
 
 
 24
 Order Civ. No. 4-87-159, Aug. 23, 1988, at 7.[1] We cannot agree that, given the state of the law during the pendency of this case, the PJH defendants waived their right to arbitration.
 
 
 25
 It is clear that a question of waiver is one of law and subject to de novo review. See Rush v. Oppenheimer & Co., 779 F.2d 885, 887 (2d Cir.1985). We, therefore, look to whether the acts of the PJH defendants constitute, as a matter of law, a voluntary relinquishment of a known right.
 
 
 26
 Federal policy clearly favors arbitration. The Supreme Court has made it clear that "[t]he Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25, 103 S.Ct. 927, 941-42, 74 L.Ed.2d 765 (1983). See also Nesslage v. York Securities, Inc., 823 F.2d 231, 234 (8th Cir.1987). This circuit has uniformly affirmed district court decisions which have found, under similar circumstances, no waiver of a right to arbitration. See Nesslage, 823 F.2d 231; Fogarty v. Piper, 781 F.2d 662 (8th Cir.1986); Phillips v. Merrill Lynch, Pierce, Fenner & Smith, 795 F.2d 1393 (8th Cir.1986). These three cases establish that, especially in cases in which any delay in making a motion to compel arbitration is based on unfavorable or uncertain law, waiver should not be found.
 
 
 27
 In Nesslage, defendants waited almost two years before filing a motion to compel arbitration, and meanwhile actively participated in discovery. Nesslage, 823 F.2d at 234. The district court found no waiver, and in affirming, we found it significant that at the time of the motion, claims arising under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 of the Securities Exchange Commission were not clearly arbitrable. Following the decision in Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985), which held that district courts must compel arbitration of pendent arbitrable claims, defendants made a motion to compel arbitration based on this change in the law. We found that since the motion "was filed soon after the Supreme Court's decision in [Byrd ]," it was "not untimely filed." Nesslage, 823 F.2d at 234.
 
 
 28
 Similarly, in Fogarty, the motion to compel arbitration was not made until over one and one-half years after the litigation began. Fogarty v. Piper, 767 F.2d 513, 514 (8th Cir.1985). Defendants argued that the delay in filing the motion was due to a change in the law. At the time litigation began, Kiehne v. Purdy, 309 N.W.2d 60 (Minn.1981) provided that Minnesota Securities Act claims were not arbitrable. During litigation, however, the Supreme Court held in Southland Corp. v. Keating, 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984) that states cannot invalidate arbitration clauses which are otherwise valid under the Federal Arbitration Act. Fogarty, 767 F.2d at 515. Thus, defendants filed a motion to compel arbitration, and this circuit agreed with the district court that defendants had not waived their right to arbitration. Fogarty, 781 F.2d at 663.
 
 
 29
 And in Phillips, the district court found no waiver where the litigation began in July of 1981, but the motion to compel arbitration was not made until March of 1985. Phillips, 795 F.2d at 1394. Plaintiff's claims arose under Rule 10b-5 and were thus not clearly arbitrable until McMahon, decided in 1987. Following the Supreme Court's decision in Byrd, which held that district courts must compel arbitration of pendent arbitrable claims, defendants filed a motion to compel arbitration, and this circuit agreed with the district court that the "motion was timely in light of the recent Supreme Court decision." Id. at 1396 n. 9.
 
 
 30
 This case involves a similar situation. Prior to Rodriguez De Quijas, the PJH defendants were correct in relying upon Wilko for the proposition that their 1933 Act claims were not arbitrable. Thus, any motion to compel arbitration, given Wilko, would have been futile. Defendants must have known this, since they did make motions to compel arbitration of the other claims which were clearly arbitrable. Counts four through nine of plaintiff's complaint, based on Rule 10b-5, common law fraud, the Minnesota Blue Sky laws, breach of contract, and RICO, were all ordered to arbitration after motions by the PJH defendants. Moreover, the PJH defendants made their motion to compel arbitration of the 1933 Act claims on September 29, 1987, soon after the decision of June 8, 1987, in McMahon (which only arguably overruled Wilko ). Thus, the PJH defendants made their motion as soon as the law appeared to allow an arbitration procedure.
 
 
 31
 Further, we cannot find waiver, the voluntary relinquishment of a known right, in a situation in which no right existed. Prior to Rodriguez De Quijas, the PJH defendants, at least in this Circuit, had no established right to compel arbitration of their 1933 Act claims. To find that the PJH defendants waived a right they did not have until after Rodriguez De Quijas is not only illogical, but also would encourage litigants, in order to avoid a finding of waiver, to file motions they knew to be futile. In Benoay v. Prudential-Bache Sec., Inc., 805 F.2d 1437 (11th Cir.1986), the Eleventh Circuit found no waiver where defendants did not file a motion to compel arbitration for over two and one-half years after litigation began. Since the motion was filed after a change in the law, the Eleventh Circuit found that the motion was timely. Id. at 1440. Like the Eleventh Circuit, we cannot "require a litigant to engage in futile gestures merely to avoid a claim of waiver." Id. (quoting Miller v. Drexel Burnham Lambert, Inc., 791 F.2d 850, 854 (11th Cir.1986)). See also Fisher v. A.G. Becker Paribas Inc., 791 F.2d 691, 696-97 (9th Cir.1986) (since the intertwining doctrine before the decision in Byrd precluded arbitration of plaintiff's claims, defendant's motion to compel arbitration before Byrd would have been futile, and failure to make it was thus not an act inconsistent with a known right); Peterson v. Shearson/American Express, Inc., 849 F.2d 464, 466 (10th Cir.1988) (citations omitted) ("Because Shearson almost certainly could not have obtained an order for arbitration of the Rule 10b-5 claim prior to McMahon, it did not waive its right to arbitrate the claim. There was no requirement that Shearson make a futile attempt to obtain arbitration on the federal claim given the state of the law; indeed, it would be difficult to argue that such an attempt had a basis in existing law."). Accordingly, we find no waiver by the PJH defendants of their right to arbitration of the 1933 Act claims.
 
 
 32
 We now consider Ackerberg's second argument, made for the first time at oral argument, in support of the district court's order refusing to compel arbitration of the 1933 Act claims. Ackerberg contends that even if we find no waiver, we cannot compel arbitration of the 1933 Act claims because Minnesota law does not allow arbitration of 1933 Act claims, and because Volt Information Sciences, Inc. v. Board of Trustees, --- U.S. ----, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989) requires that we determine arbitrability according to Minnesota law. We disagree with Ackerberg's reading of both Volt and Minnesota law.
 
 
 33
 Ackerberg relies on paragraph 15 of the customer agreement signed by PJH and Ackerberg. Paragraph 15 requires that "[t]his agreement and its enforcement shall be governed by the laws of the State of Minnesota." Ackerberg argues that the parties agreed to have Minnesota law govern any arbitration arising out of their transaction, and that Minnesota law, in Johnson v. O'Brien, 420 N.W.2d 264 (Minn.App.1988), provides that claims arising under § 12 of the 1933 Act are not arbitrable. Ackerberg thus relies on Volt to conclude that where the parties agree that state law will control their arbitration agreement, and where state law differs from federal law, the state law will control.
 
 
 34
 Volt, however, cannot be read as Ackerberg suggests. Volt involved a conflict between a provision of the California Arbitration Act which allows a court to stay arbitration pending resolution of related, third-party litigation, and the Federal Arbitration Act, which contains no such provision. The Supreme Court held that since the parties agreed that their arbitration agreement would be governed by the law of California, application of the procedural rules in the California Arbitration Act was not preempted by the Federal Arbitration Act. Volt, 109 S.Ct. at 1251. Volt thus holds that the parties to an arbitration agreement can agree that state rules concerning arbitration will govern their proceedings. It clearly does not hold that state law can determine whether any given claim is arbitrable under the Federal Arbitration Act. Whether a claim is arbitrable under federal law is not a procedural question, and Volt clearly relies on this distinction. Hence, Volt does no more than hold that where "the parties have agreed to abide by state rules of arbitration, enforcing those rules according to the terms of the agreement is fully consistent with the goals of the FAA." Id. at 1255. The Supreme Court did not hold that state law could prevent arbitration of a federal claim otherwise arbitrable under federal law.[2]
 
 
 35
 Moreover, we do not read Minnesota law to preclude arbitration of claims arising under the Securities Act of 1933. The state district court in Johnson denied defendant's motion to compel arbitration of its 1933 Act claims based on Wilko. The Minnesota Appeals Court affirmed, finding that, in 1988, Wilko was in fact controlling. The appeals court thus declined to read McMahon as if it overruled Wilko. "Until Wilko is overruled, we are compelled to apply the Supreme Court's prevailing precedents with respect to predispute arbitration agreements and federal securities law." Johnson, 420 N.W.2d at 267. Given that Wilko has now been expressly overruled, we conclude without difficulty that when construing federal law, as the Minnesota Appeals Court did in Johnson, the Minnesota courts will follow Rodriguez De Quijas and find that 1933 Act claims are arbitrable. Neither Volt nor Minnesota law, then, provides any obstacle to the arbitrability of Ackerberg's 1933 Act claims.
 
 
 36
 B. The § 12(1) 1933 Act claim against defendant Johnson
 
 
 37
 Although we find that Ackerberg's 1933 Act claims against the PJH defendants are arbitrable, we must treat the § 12(1) 1933 Act claim against defendant Johnson differently.[3] Johnson had no arbitration agreement with Ackerberg, nor was his position the same as that of the PJH defendants for purposes of federal securities law.[4] On appeal, then, Johnson argues that the district court erred in its order of August 23, 1988, in which it granted summary judgment in favor of Ackerberg by concluding that Johnson was not entitled to an exemption under § 4(1) of the 1933 Act.[5] We agree with Johnson that he is entitled, as a matter of law, to an exemption under § 4(1), 15 U.S.C. § 77d (1988), because Johnson is not an issuer, underwriter or dealer.
 
 
 38
 Johnson argues that he is entitled to an exemption under § 4(1) of the 1933 Act, which provides that the registration requirements of the 1933 Act, found in 15 U.S.C. § 77e, shall not apply to "transactions by any person other than an issuer, underwriter, or dealer."[6] 15 U.S.C. § 77d(1) (1988). We agree with the district court that the burden of proving entitlement to an exemption is on the party claiming entitlement. See SEC v. Ralston Purina Co., 346 U.S. 119, 126, 73 S.Ct. 981, 985, 97 L.Ed. 1494 (1953); G. Eugene England Found. v. First Fed. Corp., 663 F.2d 988, 989 (10th Cir.1973). We disagree, however, that Johnson has failed to meet his burden. In the absence of any finding that this transaction involved a distribution, Johnson has shown that he is not an issuer, underwriter or dealer within the meaning of § 4(1) of the 1933 Act.
 
 
 39
 The terms "issuer" and "dealer" are defined, respectively, in §§ 2(4) and (12), 15 U.S.C. §§ 77b(4) and (12). The parties do not seriously argue that Johnson was an issuer or a dealer. Clearly he is neither. Rather, Ackerberg contends that Johnson is an underwriter within § 4(1).
 
 
 40
 When considering whether Johnson is an underwriter, it is helpful to consider that the § 4(1) exemption is meant to distinguish "between distribution of securities and trading in securities." L. Loss & J. Seligman, 2 Securities Regulation 627 (3d ed. 1989) (quoting H.R.Rep. No. 85, 73d Cong., 1st Sess. 15 (1933)). See also Holschuh, 694 F.2d at 137-38 (the 1933 Act "was created to exempt routine trading transactions with respect to securities already issued and not to exempt distributions by issuers or acts of others who engage in steps necessary to such distributions").
 
 
 41
 The statutory definition of "underwriter" is found in § 2(11), 15 U.S.C. § 77b(11) (1988). "The term 'underwriter' means any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security." The congressional intent in defining "underwriter" was to cover all persons who might operate as conduits for the transfer of securities to the public. T. Hazen, The Law of Securities Regulation § 4.24, at 141 (1985) (quoting H.R.Rep. No. 85, 73d Cong., 1st Sess. 13-14 (1933)). Thus, "underwriter" is generally defined in close connection with the definition and meaning of "distribution." See Eugene England, 663 F.2d at 989 ("An underwriter is one who has purchased stock from the issuer with an intent to resell to the public."); Ingenito v. Bermec Corp., 441 F.Supp. 525, 535 (S.D.N.Y.1977) ("It is apparent that to be an underwriter within the meaning of the '33 Act, one must participate, in some manner, in the distribution of the securities to the public.") The term "underwriter" thus focuses on "distribution." Given the statutory definition of "underwriter," the exemption should be available if: (1) the acquisition of the securities was not made "with a view to" distribution; or (2) the sale was not made "for an issuer in connection with" a distribution. See 15 U.S.C. § 77b(11) (1988); ABA Report, The Section "4(1 1/2)" Phenomenon: Private Resales of "Restricted" Securities, 34 Bus.Law 1961, 1975 (July 1979); Hazen, The Law of Securities Regulation at § 4.23, at 138. Relevant to both inquiries are whether the securities have come to rest in the hands of the security holder and whether the sale involves a public offering.
 
 
 42
 We begin by considering whether the securities were acquired by Johnson with a view to their distribution. The inquiry depends on the distinction between a distribution and mere trading; so long as Johnson initially acquired his shares from the issuer with an investment purpose and not for the purpose of reselling them, the acquisition was not made "with a view to" distribution. While this determination would at first seem to be a fact-specific inquiry into the security holder's subjective intent at the time of acquisition, the courts have considered the more objective criterion of whether the securities have come to rest. That is, the courts look to whether the security holder has held the securities long enough to negate any inference that his intention at the time of acquisition was to distribute them to the public. Many courts have accepted a two-year rule of thumb to determine whether the securities have come to rest. See United States v. Sherwood, 175 F.Supp. 480, 483 (S.D.N.Y.1959) ("The passage of two years before the commencement of distribution of any of these shares is an insuperable obstacle to my finding that Sherwood took these shares with a view to distribution thereof."). This two-year rule has been incorporated by the SEC into Rule 144, which provides a safe harbor for persons selling restricted securities acquired in a private placement. 17 C.F.R. § 230.144 (1989). Professor Loss has also noted that a three-year holding period is "well nigh conclusive" that securities were acquired without a view to distribution. L. Loss & J. Seligman, 2 Securities Regulation at 672.
 
 
 43
 Johnson purchased his securities in 1979 or 1980, when Vertimag Systems was incorporated in California. He did not sell any of these shares to Ackerberg until 1984. While Ackerberg contends that the Roger Lindquist Partnership purchased its shares with a view to distribution, given an ongoing pattern of distributions beginning shortly after the partnership's acquisition of its shares, see Brief for Appellee at 15-16, Ackerberg makes no such contention about Johnson's shares. Thus, Johnson held his shares for at least four years before selling them to Ackerberg, a period well in excess of the usual two years required to find that the securities have come to rest.
 
 
 44
 Our second inquiry is whether the resale was made "for an issuer in connection with" a distribution. Whether the sale was "for an issuer" can also be determined by whether the shares have come to rest. That is the best objective evidence of whether a sale is "for an issuer" is whether the shares have come to rest. See ABA Report, 34 Bus.Law. at 1975.
 
 
 45
 To determine whether the sale was made "in connection with" a distribution, however, requires that we consider directly the meaning of "distribution," and thus whether the resale involved a public offering. The definition of "distribution" as used in § 2(11) is generally considered to be synonymous with a public offering. In Gilligan, Will & Co. v. SEC, 267 F.2d 461 (2d Cir.), cert. denied, 361 U.S. 896, 80 S.Ct. 200, 4 L.Ed.2d 152 (1959), the court explained the connection between "underwriter," "distribution," and "public offering." "Since § 2(11) ... defines an 'underwriter' as 'any person who has purchased from an issuer with a view to * * * the distribution of any security' and since a 'distribution' requires a 'public offering,' ... the question is whether there was a 'public offering.' " Id. at 466 (quoting H.R.Rep. No. 1838, 73d Cong., 2d Sess. (1934)). See also L. Loss & J. Seligman, 2 Securities Regulation at 1109 n. 567 (to find an underwriter, the sale must involve a contemplated distribution, "a term which the Commission regards as more or less synonymous with 'a public offering' as used in section 4(2)"); ABA Report, 34 Bus.Law. at 1962 (a distribution "is generally considered to be functionally equivalent to a 'public offering' as used in section 4(2)").
 
 
 46
 The case law is equally clear that a public offering is defined not in quantitative terms, but in terms of whether the offerees are in need of the protection which the Securities Act affords through registration. Thus, the Supreme Court held in SEC v. Ralston Purina, 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953) that the proper focus is on the need of the offerees for information.
 
 
 47
 Since exempt transactions are those as to which "there is no practical need for [the bill's] application," the applicability of [the private placement exemption] should turn on whether the particular class of persons affected needs the protection of the Act. An offering to those who are shown to be able to fend for themselves is a transaction "not involving any public offering."
 
 
 48
 Id. at 125, 73 S.Ct. at 984. This circuit has followed Ralston Purina by finding that a public offering "turns on the need of the offerees for the protections afforded by registration.... If the offerees have access to such information, registration is unnecessary, and the section 4(2) exemption should apply." Van Dyke v. Coburn Enter., Inc., 873 F.2d 1094, 1098 (8th Cir.1989). See also Sorrell v. SEC, 679 F.2d 1323, 1326 (9th Cir.1982) ("The offeree's access to financial information about the investment, similar to what would be found in a registration statement, is crucial.").
 
 
 49
 That "distribution" should be read in terms of "public offering," and the need of the offerees for information, makes sense in light of the purpose of the 1933 Act as construed by this circuit. We held in Van Dyke that "[t]he design of the Act is to protect investors by promoting full disclosure of information thought necessary to make informed investment decisions." Van Dyke, 873 F.2d at 1097. Moreover, the parties in this case do not dispute that Ackerberg is a sophisticated investor, not in need of the protections afforded by registration under the 1933 Act. As earlier stated, Ackerberg read and signed a subscription agreement in which he represented that: he had the knowledge and experience in investing to properly evaluate the merits and risks of his purchase of Vertimag securities; he was able to bear the economic risk of the investment in Vertimag securities; he was given full and complete information regarding Vertimag Systems Corporation; he knew that the securities were not registered under the 1933 Act, and were being sold pursuant to exemptions from the 1933 Act; and he knew that the sale was being made in reliance on his representations in the subscription agreement. Ackerberg further represented that his net worth was substantial, and the record clearly shows that Ackerberg is, if not a conscientious investor, at least a prolific one. We, therefore, have no trouble finding that Ackerberg is a sophisticated investor and not in need of the protections afforded by registration under the 1933 Act. Hence, this case involves no public offering, and thus no distribution. Absent a distribution, Johnson cannot be an underwriter within § 4(1), and is, therefore, entitled to that exemption.
 
 III. CONCLUSION
 
 50
 Because we find that the PJH defendants did not waive their right to arbitration, and that they timely filed their motion to compel arbitration in light of McMahon, we must, in reliance on Rodriguez De Quijas, reverse the order of the district court refusing to compel arbitration of the 1933 Act claims against the PJH defendants. We must also reverse the district court order granting summary judgment in favor of Ackerberg on his § 12(1) 1933 Act claim against defendant Johnson. We thus remand this case to the district court with instructions to order to arbitration the 1933 Act claims against the PJH defendants, and to dismiss the § 12(1) 1933 Act claim against defendant Johnson.
 
 
 
 [1]
 The parties disagreed at oral argument about whether this finding of the district court was dictum. Ackerberg argued that the district court clearly found waiver, to which the PJH defendants responded that the district court itself thought that its conclusion was merely dictum. The PJH defendants cite a statement by the district court at a motion for reconsideration: "Well, you know, in the appeals court context, that would be pure dictum. Frankly, you know, it is more support for the decision." Transcript of Proceedings, September 28, 1988, at 35. Since the question of waiver of a right to arbitration is a matter of law, and subject to de novo review, we treat the district court's order as if it did in fact find waiver
 
 
 [2]
 The procedural rule at issue in Volt is a provision permitting a court to stay arbitration pending resolution of related litigation between third parties and a party to the arbitration agreement. See Cal.Civ.Proc.Code Ann. § 1281.2(c) (West 1982). The Supreme Court found that allowing the agreement of the parties to adhere to the California rules, and thus to this provision, did not conflict with any federal policy favoring arbitration; the Federal Arbitration Act "simply requires courts to enforce privately negotiated agreements to arbitrate." Volt, 109 S.Ct. at 1255. To give Volt the reading urged by Ackerberg would, however, clearly contravene the federal policy favoring arbitration
 
 
 [3]
 We do not deal with the § 12(2) 1933 Act claim against Johnson alleged in the second count of Ackerberg's complaint. The § 4(1) exemption is irrelevant to this claim, which is based on misrepresentation
 
 
 [4]
 While Ackerberg acknowledges that Johnson's position is not the same as that of the PJH defendants, Ackerberg suggests that the merit of Johnson's claim to an exemption under § 4(1), 15 U.S.C. § 77d(1) (1988), is determined by the actions of the PJH defendants. Ackerberg argues that because of the involvement of PJH, a broker and, therefore, a dealer within § 4(1), the § 4(1) exemption cannot be available for Johnson, even if Johnson is not an issuer, underwriter or dealer. We disagree. While it is true that § 4(1) exempts transactions and not individuals, see, e.g., SEC v. Holschuh, 694 F.2d 130, 137-38 (7th Cir.1982), the mere involvement of a broker, qua broker, in a secondary transaction by persons other than an issuer, underwriter or dealer, is insufficient to vitiate the exemption. PJH's role as broker cannot convert the transaction into one "by someone who was an issuer, underwriter or dealer." Holschuh, 694 F.2d at 138 (emphasis added). PJH owned no Vertimag securities and sold none. Were its involvement enough to deny the § 4(1) exemption to persons not issuers, underwriters or dealers, few secondary transactions involving the resale of restricted securities would be exempt under § 4(1). Ackerberg has cited no persuasive authority that such is the law, and given that the purpose of the § 4(1) exemption is to exempt trading as opposed to distributions, we cannot agree with Ackerberg's contention
 Nor can we agree that the exemption is not available to Johnson because PJH is an underwriter. The district court, as discussed infra, failed to find that any distribution occurred, and, as a matter of law, none did occur in this case. Absent a distribution, no party to the transaction can be an underwriter.
 
 
 [5]
 There is no indication in the record that Johnson moved for reconsideration of the district court's order of March 14, 1986, in which the district court refused to dismiss the 1933 Act claims against Johnson. Nor does Johnson appeal from this order now. Rather, Johnson appeals from the district court's order of August 23, 1988, granting summary judgment in favor of Ackerberg, and against Johnson, on the 1933 Act claims. Because we disagree that Johnson did not prove entitlement to the § 4(1) exemption, we must do more than set aside the summary judgment in favor of Ackerberg. If Johnson is entitled to the § 4(1) exemption, then the § 12(1) claim against him must be dismissed
 
 
 [6]
 It is clear that the applicable and appropriate exemption to be applied in this case is § 4(1). To the extent that Ackerberg argues that both Johnson and the PJH defendants rely on a " § 4(1 1/2)" exemption, he misunderstands the nature of a § 4(1) exemption. While the term "s 4(1 1/2) exemption" has been used in the secondary literature, see, e.g., ABA Report, The Section "4(1 1/2)" Phenomenon: Private Resales of "Restricted" Securities, 34 Bus.Law.1961 (July 1979); Schneider, Section 4(1 1/2)--Private Resales of Restricted or Control Securities, 49 Ohio St.L.J. 501 (1988), the term does not properly refer to an exemption other than § 4(1). Rather, the term merely expresses the statutory relationship between § 4(1) and § 4(2). That is, the definition of underwriter, found in § 2(11), 15 U.S.C. § 77b(11) (1988), depends on the existence of a distribution, which in turn is considered the equivalent of a public offering. Section 4(2) contains the exemption for transactions not involving a
 public offering. Any analysis of whether a party is an underwriter for purposes of § 4(1) necessarily entails an inquiry into whether the transaction involves a public offering. While the term "4(1 1/2) exemption" adequately expresses this relationship, it is clear that the exemption for private resales of restricted securities is § 4(1). We need not go beyond the statute to reach this conclusion.