**William HEDDEN, an individual; Arnold Gendel, an individual; Plaintiffs,**

**v.**

**Gino A. MARINELLI, an individual; Marie Marinelli, an individual; Defendants.**

**and all Related Cross–Actions.**

**No. C 91 0906 RFP FSL.**

United States District Court, N.D. California.

Jan. 28, 1992.
Judgment, March 11, 1992.

Michael D. Stokes, Leboeuf Lamb Leiby & Macrae, San Francisco, Cal., for plaintiffs.

J. Bradley Russell, Wittman Fedynshyn & Roberts, San Diego, Cal., for defendants.

## MEMORANDUM AND ORDER

PECKHAM, District Judge.

### INTRODUCTION

This matter comes before the court on Defendants' Gino and Marie Marinelli's motion for summary judgment. Defendant Gino Marinelli seeks summary judgment on Plaintiffs' claims for violation of Sections 12(1) and 12(2) of the Securities Act of 1933 ("the 1933 Act"), Section 10(b) and Rule 10b–5 of the Securities Exchange Act of 1934 ("the 1934 Act") and breach of contract. Defendant Marie Marinelli claims as a complete defense to all Plaintiffs' charges that she did not own any of the stock and should not, therefore, be a party to this case. Defendant Gino Marinelli further seeks summary judgment on his counterclaim for $60,000 owed from Plaintiff Gendel for stock which Gendel purchased from him.

### BACKGROUND

This dispute concerns a sale of stock by Defendant Gino Marinelli to Plaintiffs Hedden and Gendel in 1990. Marinelli sold Plaintiffs stock which he acquired in the American Confectionery Corporation ("ACC") where he served as executive vice-president.

Marinelli acquired his position at ACC when, in 1987, ACC bought the assets of a chocolate company where Marinelli was a management employee. In order to retain

the existing management of the purchased chocolate manufacturer, ACC invited Marinelli to remain in their employ and offered him 865,000 shares in ACC as part of his compensation for employment. Marinelli later became the executive vice-president of ACC, president of the ACC candy division and president of certain candy manufacturing enterprises held by ACC.

Sometime in 1990, Marinelli offered his stock in ACC for sale. Plaintiffs Hedden and Gendel were approached by ACC representative, Kirscher, and told that Marinelli wanted to distribute his large block of ACC stock. Marinelli claims he wanted to sell his ACC stock because he was resigning from all management positions with ACC. Plaintiffs, on the other hand, contend that at the time the stock transaction occurred, Marinelli still held all of the key management positions listed above and that it was not until later, on advice of counsel, that he "purported" to resign from his various positions. Plaintiffs further maintain that the resignations, when they occurred, were nothing more than "window dressing" since Marinelli retained control of the manufacturing operations of the corporation until the following year.

Letter agreements were entered into by Marinelli and Plaintiffs. The agreements recited that the stock sale was intended to conform with SEC Rule 144 which provides a safe harbor under certain conditions, exempting sellers from the registration requirements imposed by the 1933 Act. Forms 10–K and 10–Q containing financial data for ACC, were shown to Plaintiffs before the purchase. Plaintiffs were also shown pro forma financials containing financial projections for ACC which projected second quarter revenues for 1990 of over $1,000,000.

Plaintiffs Hedden and Gendel agreed to purchase the ACC stock. Plaintiff Hedden purchased 450,000 shares and Plaintiff Gendel bought 150,000 shares. It appears that Plaintiff Gendel was the CEO of ACC at the time he agreed to purchase the stock and Plaintiff Hedden was appointed to the board of directors of ACC sometime after the stock transfer. The financial projec-

tions contained in the pro formas were never achieved and, in fact, ACC experienced a revenue loss of $200,000 for the second quarter of 1990. Additionally, the value of ACC stock dropped and ACC filed for protection under Chapter 11 of the bankruptcy laws. ACC stock is apparently worthless at present.

After the plunge in ACC stock value, Plaintiffs filed the instant action against Gino and Marie Marinelli pursuant to Sections 12(1) and 12(2) of the 1933 Act and Section 10(b) of the 1934 Act. Plaintiffs seek rescission of the stock sale under Section 12 and compensatory damages under 10b–5.

Defendant Gino Marinelli has counterclaimed against Plaintiff Gendel for $60,000 owed pursuant to a document signed by Mr. Gendel in favor of Mr. Marinelli for the stock sold by Marinelli to Gendel. This document does not contain a demand date and Gendel claims that, although he signed it, the parties never worked out the final terms of the note.

Marie Marinelli did not own any of the ACC stock sold to Plaintiffs. Additionally she held no position at ACC. She has been named as a Defendant in this suit because Gino Marinelli, her husband, directed Plaintiff Hedden make his payment for the securities by wire to her account.

## DISCUSSION

1. *Liability Under the 1933 Act:*

a. Application of the 1933 Act Beyond Issuer Transactions:

Defendant Gino Marinelli asserts that Plaintiffs' claims pursuant to Section 12(1) and 12(2) of the 1933 Act must be dismissed because the transaction complained of in this case was not an initial offering of ACC stock and as such the 1933 Act do not apply.

Section 12(2) of the 1933 Act provides as follows:

Any person who ...
(2) Offers or sells a security ... by the use of any means or instruments of transportation or communication in inter-

state commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading ... and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him ...

15 U.S.C. § 77*l*(2).

There is a split of opinion regarding whether Section 12 should apply outside the context of initial offerings to cover secondary market transactions. Those courts holding that Section 12 should not be limited to the context of initial offerings reach this conclusion because there is no explicit restriction contained within the language of Section 12. Additionally, although Section 12 refers to misstatements in a "prospectus", suggesting an initial offering, the definition of "prospectus" in the 1933 Act defines the term as a written offer to sell without any indication that it is limited to offers in initial distributions.

Despite the lack of limiting language in the 1933 Act, however, a majority of district courts and the Third Circuit have held that Section 12(2) is limited to initial offerings and does not apply to secondary market transactions. *See eg. Ballay v. Legg Mason Wood Walker, Inc.*, 925 F.2d 682, 693 (3d Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 79, 116 L.Ed.2d 52 (1991); *Grinsell v. Kidder, Peabody & Co.*, 744 F.Supp. 931 (N.D.Cal.1990); *Bank of Denver v. Southeastern Capital Group, Inc.*, 763 F.Supp. 1552, 1559 (D.Colo.1991). In such cases the courts refused to apply Section 12 to impose liability upon enterprises, such as brokerage firms, involved in secondary market transactions.

In reaching the conclusion that Section 12(2) does not apply to certain secondary market transactions, these courts relied, in part, upon the legislative history of the 1933 Act which strongly suggests that the Act was intended to address the need for regularized registration of securities before their initial offering to the public in order to provide adequate disclosure of information held by the issuer to the public. This court agrees that under the facts presented to those courts, involving instances of secondary trading conducted through brokerage firms, it was prudent to withhold the application of the 1933 Act since such entities are quite removed from the initial issuer and not necessarily privy to inside information regarding the company.

■ This court cannot conclude, however, that Section 12 is always inappropriate in the context of secondary market sales. The House Report accompanying the 1933 Act stated that the Act was designed to "affect [ ] only new offerings of securities ... [and] does not affect the ordinary redistribution of securities *unless such redistribution takes on the characteristics of a new offering by reason of the control of the issuer possessed by those responsible for the offering.*" H.R.Rep. No. 85, 73d Cong., 1st Sess. 5 (1933) (emphasis added). Thus, the Act may be appropriately applied when a corporate insider sells his own stock in such a manner that it takes on the characteristics of a new offering.

This concern for control was further elaborated in a later portion of the House Report discussing the scope of the underwriter definition contained in Section 2(11) of the Act. According to the House,

All the outstanding stock of a particular corporation may be owned by one individual or a select group of individuals. At some future date they may wish to dispose of their holdings and to make an offer of this stock to the public. Such a public offering may possess all the dangers attendant upon a new offering of securities. Whenever such a redistribution reaches significant proportions, the distributor would be in the position of controlling the issuer and thus able to furnish the information demanded by the bill. This being so, the distributor is treated as equivalent to the original is-

suer, and, if he seeks to dispose of the issue through a public offering, he becomes subject to the act. The concept of control herein involved is not a narrow one, depending upon a mathematical formula of 51 percent of voting power, but is broadly defined to permit the provisions of the act to become effective wherever the fact of control actually exists.

*Id.* at 13–14.

■ In the instant case, the sale of ACC securities by Marinelli to Hedden and Gendel may be precisely the sort of redistribution of securities which takes on the characteristics of a new offering and may, therefore, be one to which Section 12(2) should apply. In this case, Plaintiffs contend that Defendant Marinelli held certain positions of control within ACC at the time of the stock transfer. Plaintiffs further claim that even after he resigned from his management positions, he retained extensive control over the workings of ACC. Because there is a dispute as to the degree of control over ACC affairs maintained by Defendant Marinelli both during and after the stock transfer to Hedden and Gendel, this court cannot conclude that in this case, as a matter of law, Section 12(2) of the 1933 Act cannot apply to impose liability on Defendant Marinelli.

■ Section 12(1) provides a cause of action for the sale of a security in violation of Section 5 of the 1933 Act, which requires that a registration statement be in effect before a security is offered for sale. Our conclusion that Section 12(2) may apply to secondary market transactions which take on certain characteristics of initial offerings by virtue of the control exercised by the seller of the stock, applies with equal force to Section 12(1). Thus, we cannot rule, as Defendant requests, that Section 12(1) is automatically precluded because the sale at issue was a secondary market transaction.

b. Availability of Section 4(1) Exemption:

■ Although we are unwilling to hold that the 1933 Act does not, as a matter of law, apply to *any* secondary stock transfer, we must now determine whether the transaction complained of in this case is exempted by Section 4(1) of the 1933 Act which exempts transactions involving persons other than issuers, underwriters, or dealers, as Defendant has argued. Neither party suggests that Marinelli may be considered an issuer or dealer of the stock sold. The disputed issue is whether Gino Marinelli can be considered an underwriter and thus, defeat the application of this exemption.

Plaintiffs claim that the transaction is not entitled to the 4(1) exemption because Defendant Gino Marinelli can be considered an underwriter due to the control relationship existing between Marinelli and the issuer, ACC. According to Plaintiffs, the definition of "underwriter" contained in Section 2(11) of the 1933 Act and the legislative history which accompanied the introduction of the Act in 1933 suggest possible underwriter status for Marinelli. Plaintiffs argue that the definition and the language of the House Report cited above which discusses the possibility of control persons being included within the definition of underwriters and issuers, indicates that the term underwriter should be broadly defined to include persons such as Mr. Marinelli. Congress feared, Plaintiffs argue, that without the imposition of the 1933 Act requirements on persons such as Mr. Marinelli, the protections of the Act would be eviscerated since all the outstanding stock of a public corporation could be held by a small group of control shareholders who could later decide to sell its holdings to the public. Without formal registration and disclosure requirements, such offerings would present all the dangers of a new securities offering.

Plaintiffs have presented indicia of Defendant's control relationship with ACC before and during the time of the sale. More than a seller's possible control relationship is required, however, to establish underwriter status and preclude the exemption provided in Section 4(1). The term "underwriter" applies to "any person who has purchased from an issuer with a view to, or

offers or sells for an issuer in connection with, the distribution of any security." 15 U.S.C. § 77b(11). The congressional intent of this definition was to cover all persons who might operate as conduits for the transfer of securities to the public. T. Haze, The Law of Securities Regulation § 4.24 at 141 (1985). Thus, in order to be an underwriter one must participate in a distribution of securities to the public. *Ingenito v. Bermec Corp.*, 441 F.Supp. 525, 535 (S.D.N.Y.1977).

The Eighth Circuit has addressed the application of the 4(1) exemption when an insider sells stocks. *See Ackerberg v. Johnson*, 892 F.2d 1328 (8th Cir.1989) (Section 4(1) exemption applied to sale of stock by Chairman of Board of corporation who was also the founder of the company and its largest individual stockholder). In *Ackerberg* the court elaborated a two-prong analysis to be applied to determine whether such an individual could be considered an underwriter and therefore lose the benefit of the 4(1) exemption. Relying on the language contained in the definition of underwriter found in the 1933 Act, the court found that the exemption should be available if: (1) the acquisition of the securities was not made "with a view to" distribution and (2) the sale was not made "for an issuer in connection with a distribution". *Id.* at 1336. "Relevant to both inquiries are whether the securities have come to rest in the hands of the security holder and whether the sale involves a public offering." *Id.*

The first step in this analysis is to determine whether Marinelli acquired the stocks with a view to distribution. Although this may appear to entail a subjective inquiry, courts have applied a two year rule of thumb to test whether stocks have come to rest in the hands of a purchaser. *See U.S. v. Sherwood*, 175 F.Supp. 480, 483 (S.D.N.Y.1959). This rule of thumb has been adopted by the SEC in their safe-harbor provisions governing the sale of unregistered securities. 17 C.F.R. § 230.144 (1989).

Slightly over two years transpired between Marinelli's purchase and sale of the stock. He acquired the shares of ACC as compensation for his employment with ACC as a management employee after ACC purchased Marinelli's previous employer. Marinelli received the stock on September 12, 1988 and the disputed stock sale occurred after November 12, 1990. Thus, it does not appear that Marinelli acquired the stock with a view to distribution. This does not, however, defeat a finding that he is an underwriter. The second prong of the analysis remains.

The second question to be answered in determining Marinelli's possible underwriter status is whether he sold the stock "for an issuer in connection with a distribution". Whether or not a distribution of stock occurs depends upon whether there was a public offering. *Ackerberg*, 892 F.2d 1328, 1337; *G. Eugene England Found. v. First Fed. Corp.*, 663 F.2d 988, 989 (10th Cir.1973); *Ingenito v. Bermec Corp.*, 441 F.Supp. 525, 535 (S.D.N.Y.1977). The interpretation of distribution in terms of whether a "public offering" occurred makes sense in light of the purpose of the 1933 Act which is certainly to protect investors by promoting full disclosure of information necessary to make informed investment decisions. *See Van Dyke v. Coburn Enter., Inc.*, 873 F.2d 1094, 1098 (8th Cir. 1989).

According to the United States Supreme Court, the question of whether a public offering has occurred depends not on the number of offerees, but on whether the offerees need the protection provided by the 1933 Act. Thus, in *SEC v. Ralston Purina Co.*, the Court stated that "[a]n offering to those who are shown to be able to fend for themselves is a transaction 'not involving a public offering'". 346 U.S. 119, 125, 73 S.Ct. 981, 984, 97 L.Ed. 1494 (1953).

Defendants have introduced substantial evidence to support the conclusion that Plaintiffs are sophisticated investors, not in need of 1933 Act protection. Plaintiff Hedden, for example, has a bachelor's degree in economics from Stanford University and a law degree from Hastings. Additionally, Hedden founded a mortgage banking com-

438

pany and was the founding director of a bank and trust company and its holding company. In addition, Hedden's deposition testimony suggests that he received a salary of $200,000 per year for the two years preceding the disputed transaction.

The evidence with respect to Plaintiff Gendel indicates that he invested in many stock transactions involving sums in excess of $50,000. In addition, Defendants argue that he was CEO of ACC at the time he signed his representation letter. Defendants further claim that Plaintiff Gendel had a net worth of over $1,000,000 at the time of the sale.

Despite this evidence, however, this court cannot conclude that these individuals were sufficiently sophisticated to not require the protections of the 1933 Act. Plaintiffs have disputed the importance of this evidence and claim that the question of sophistication should be decided by the trier of fact. Interpreting this evidence regarding Plaintiffs' sophistication in favor of Plaintiffs, the non-moving party, we do not consider that the evidence requires this court to conclude that Plaintiffs were sophisticated investors.

Hedden's deposition statement regarding his salary was not conclusive. In response to the question of whether his salary was $200,000 or greater before the sale, he answered "yes, probably, it could have been." In response to the evidence of Gendel's extensive investments, Plaintiffs claim that all these transactions actually involved the reinvestment of the same sum. In addition, there appears to be some dispute and confusion regarding the date of the signing of the representation letter and therefore we cannot say that Gendel clearly enjoyed CEO status at the time he entered the

transaction. Finally, Plaintiffs point out that the valuation of Mr. Gendel's worth to be $1,000,000 was largely due to the value of his personal residence, which he built himself.

Thus, because there is a dispute regarding the investment sophistication of Plaintiffs and because this is clearly an issue to be resolved by the fact finder, this court cannot grant summary judgment for Defendants regarding the application of the Section 4(1) exemption.[1]

### 2. Section 10(b) of the 1934 Act:

Rule 10b–5 enacted pursuant to Section 10(b) of the 1934 Act imposes liability on a party for material misstatements or omissions in connection with the sale of any security. In general, to prevail on a Rule 10b–5 claim, a plaintiff must establish that the defendant (1) made a false statement or an omission of material fact, (2) with scienter, (3) upon which the plaintiff justifiably relied, and (4) which proximately caused the plaintiff's damages.

In their complaint, Plaintiffs claim that Marinelli failed to adequately disclose that ACC was in very difficult financial straits, and was facing imminent collapse. In addition, the complaint asserts that Marinelli never informed Hedden or Gendel of any significant financial difficulties of which they should have been informed before investing in ACC. Further, Plaintiffs claim that they relied upon inaccurate pro forma financials provided by Marinelli which projected unrealistically high earnings in 1991. Plaintiffs also claim that Marinelli failed to inform them of material inside information of which he was in possession at the time of the sale.

**1.** Plaintiffs have argued that Defendant Marinelli's claim that he is not an underwriter is an affirmative defense to Plaintiff's prima facie case and therefore is not admissable at this stage in the litigation since it was not pled in Defendants' Answer. Although an affirmative defense must be pled in the answer pursuant to Rule 8 of the Federal Rules of Civil Procedure, this court does not agree with Plaintiff's contention that this is an affirmative defense. Affirmative defenses are those claims which raise matters outside the scope of a plaintiff's prima facie

case such as accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, res judicata or statute of frauds. Defendant's claim that he is not an underwriter squarely implicates the prima facie claims made by Plaintiffs in this action.

Defendants have filed a motion to file an amended answer in the event this court finds the underwriter denial to be an affirmative defense. Because we do not consider it to be an affirmative defense, Defendant need not seek leave of court to file an amended answer.

Defendant Gino Marinelli has presented evidence suggesting that he was not responsible for the inaccurate projections and that, in fact, the difficulties experienced by ACC after the stock sale were the result of decisions made after he left the organization when Plaintiffs were serving in high management positions. In addition, Defendant Marinelli has presented evidence to indicate that he did, in fact, inform Plaintiffs of the financial instability of ACC at the time of the sale.

■ Defendant Marinelli provided Plaintiffs with pro forma predictions of ACC profitability which turned out to be inaccurate. The pro formas received by Plaintiffs predicted over $1 million in profits for 1991, and ACC, in fact, experienced losses for that period. Defendant Marinelli claims that such predictions are not actionable under 10b–5. We cannot agree that predictions of future earnings are never actionable under 10b–5, however. In this circuit, inaccurate projections may be actionable if it is shown that, at the time they were made, the projections were: (1) not believed by the speaker, (2) that there was no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending to seriously undermine the accuracy of the statement. *In re Apple Computer Securities Litigation*, 886 F.2d 1109 (9th Cir. 1989), *cert. denied sub nom. Schneider v. Apple Computer, Inc.*, 496 U.S. 943, 110 L.Ed.2d 676, 110 L.Ed.2d 676 (1990). Defendant has not presented evidence to negate the possibility that Plaintiff can prove one of these elements at trial.

In addition, Defendant has introduced evidence that Plaintiffs signed letters prepared by Marinelli which set forth their understanding that ACC was in the process of restructuring and that it planned to offer common stock to raise necessary operating capital. This letter, Marinelli contends, defeats Plaintiffs' claims that he did not adequately disclose the financial instability of ACC. Plaintiffs argue, however, that this letter cannot defeat their claim that Marinelli did not disclose material information because it was actually a form letter which they did not prepare and over which they had no control. Additionally, this language does not necessarily communicate that ACC was experiencing any acute financial instability.

Marinelli has also introduced evidence suggesting that a significant portion of the financial loss experienced by ACC after the stock sale resulted from the forgiveness of certain debt to a company owned by the principals of ACC's major lender, who in return released certain corporate insiders from their personal guarantee of corporate debt. This loan forgiveness cost ACC approximately $1 million.

In addition, ACC represented in its Disclosure Statement to the bankruptcy court that it filed for Chapter 11 protection because it lacked sufficient working capital. This, Defendant Marinelli claims, proves that ACC filed for bankruptcy because it failed to obtain the $1.5 million cash infusion for working capital that was referenced in the letters signed by Plaintiffs.

Although this evidence certainly weighs in Defendant Marinelli's favor and if introduced at trial may defeat a finding of his liability under Section 10(b) and Rule 10b–5, Defendant Marinelli has not met his burden under Rule 56 of demonstrating that he is entitled to the dismissal of the 10(b) claims as a matter of law and undisputed fact. Although Marinelli's evidence regarding the loan forgiveness suggests that a significant portion of the losses experienced in 1991 were attributable to matters outside his knowledge and control, Marinelli has not conclusively established that the downfall of ACC was a result of this transaction and not to matters of which he was aware at the time of the sale. Additionally, this court cannot conclude that the boilerplate language contained in the letters signed by Plaintiffs is sufficient to convince a trier of fact that Plaintiffs had been adequately informed of possible financial difficulties at ACC. In addition, although the loan forgiveness may explain the failure of the pro formas to accurately predict the financial position of ACC in 1991, and therefore dispel any liability for Marinelli on the pro forma claim, it does not defeat Plaintiffs' other 10b–5 claims

that Marinelli withheld information and failed to adequately disclose the financial instability of the company.

Federal Rule of Civil Procedure 56(c) provides for the granting of summary judgment where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The burden of establishing that there is no genuine issue of material fact lies with the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Additionally, the court must view the evidence presented on the motion in the light most favorable to the opposing party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). On the basis of the evidence presented by Defendant, we cannot conclude that he has met his burden with respect to 10b–5 liability. Thus, we must deny Defendant's motion for summary judgment on the 10(b) and Rule 10b–5 claims.

### 3. *Breach of Contract:*

The breach of contract claim stands or falls with the underlying claims of securities violation. Because the 1933 Act and 1934 Act claims remain unresolved, we cannot grant summary judgment on the breach of contract claim at this time.

### 4. *Claim Against Marie Marinelli Under 1933 Act:*

Defendant Marie Marinelli seeks dismissal of the 1933 Act claims against her on the grounds that she did not own any of the ACC stock at issue in this case. It appears that the only connection she had to the transaction was that Plaintiff Hendel was instructed to wire the money for the stock to her account.

At oral argument, Plaintiffs' counsel represented that he had only included Marie Marinelli as a party on the 1933 Act claims out of an abundance of caution to prevent Gino Marinelli from arguing, in the event his liability was established and the remedy of rescission sought, that Marie Marinelli had the funds received for the stocks.

In light of the circumstances of this case and the admission of Plaintiffs' counsel that Mrs. Marinelli was added to the case out of an abundance of caution, this court does not find that Mrs. Marinelli was sufficiently connected to the transaction to warrant imposing liability upon her.

In the event, however, that Plaintiffs prevail on their Section 12 claims and seek rescission of the sale, this court does not expect that Defendant Gino Marinelli will claim that the stock transaction proceeds are actually the property of his wife and therefore, unavailable to Plaintiffs through this action.

### 5. *Counterclaim for $60,000:*

██ Defendant Marinelli seeks a ruling that he is entitled to payment of the $60,000 note issued by Plaintiff Gendel in his favor for the ACC stock transferred from Marinelli. Despite the fact that the note did not include a due date, Marinelli claims that such a note is due upon demand according to California law. Cal.Comm.Code § 3108.

Plaintiff has introduced evidence that there is substantial confusion over the status of the note. There is a dispute regarding whether the document was a note or a stock pledge agreement, which would have limited Marinelli's recovery in the event of a breach to return of the stock, to which Mr. Gendel would be happy to agree. In addition, the attorney who drafted the instrument claims that the parties had not completed their negotiations over the note before it was signed. Thus, this court concludes that there is sufficient material dispute regarding the exact nature of this document and the intent of the parties in entering into this agreement, to warrant the denial of Defendant Gino Marinelli's claim for summary judgment seeking its enforcement.

In addition, if Plaintiffs succeed with their 1933 and 1934 Act claims, Gendel may have a defense to his liability under the note.

### CONCLUSION

In light of the foregoing,

1. Defendant Gino Marinelli's motion for summary judgment in his favor on the Plaintiffs' claims under Sections 12(1) and 12(2) of the 1933 Act, Section 10(b) and Rule 10b–5 of the 1934 Act and breach of contract is denied;

2. Defendant Marie Marinelli's motion for summary judgment seeking dismissal of Plaintiffs' 1933 Act claims against her is granted; and

3. Defendant Gino Marinelli's motion for summary judgment on his counterclaim for monies owed to him by Plaintiff Hedden is denied.

IT IS SO ORDERED.

### JUDGMENT IN FAVOR OF DEFENDANTS ON COMPLAINT

This matter came on for trial on Wednesday, February 5, 1992, at which time an eight-person jury was impanelled and duly sworn. Plaintiffs WILLIAM HEDDEN and ARNOLD GENDEL (collectively "the Plaintiff") were represented by Michael Stokes, Esq., Richard C. Cole, Esq., and Stanford Kingsley, Esq., of LeBoeuf, Lamb, Leiby & MacRae; Defendants GINO and MARIE MARINELLI (collectively "the Defendants") were represented by J. Bradley Russell, Esq., of Wittman, Fedynyshyn & Roberts.

The case was recessed on February 5, 1992 and reconvened on February 11, 1992. Opening statements and trial commenced on February 11, 1992 and continued until February 13, 1992.

On the afternoon of February 13, 1992, after the close of evidence by both sides and closing arguments, the jury was instructed and the case was submitted for decision. The jury was given a general verdict relating to each of the Plaintiffs' cases against the Defendants, and upon Defendants' counter-claim against Plaintiff GENDEL.

After deliberations, the jury returned a verdict in the late afternoon of February 13, 1992. The following verdict was delivered by the foreperson and read in open court by the clerk:

We the jury find *against* Plaintiff William Hedden on his claim against Defendant Gino Marinelli.

We the jury find *against* Plaintiff Arnold Gendel on his claim against Defendant Gino Marinelli.

We the jury find *in favor of* Counter-Claimant Gino Marinelli on his claim against Arnold Gendel.

The jurors, being asked, all acknowledged that this was their verdict. Polling of the jurors was not requested by either party, so the jury was then excused.

NOW THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED THAT Plaintiffs' complaint against Defendants is hereby dismissed. All issues relating to costs, interest and attorneys' fees shall be decided at a hearing upon noticed motion by Defendants.