**FUJISAWA PHARMACEUTICAL
CO., LTD. and Fujisawa
USA, Inc., Plaintiffs,**

v.

**John N. KAPOOR, Defendant.**

No. 92 C 5508.

United States District Court,
N.D. Illinois, E.D.

Feb. 10, 1993.

Chaim T. Kiffel, Robert J. Kopecky, Kirkland & Ellis, Chicago, IL, Jonathan Zavin, Kenneth I. Schacter, Ted Poretz, Richards & O'Neil, New York City, for plaintiffs.

George Carter Lombardi, Dan K. Webb, W. Gordon Dobie, Kathleen L. Leyden, Winston & Strawn, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

PLUNKETT, District Judge.

This matter is before us on the Motion of Defendant Kapoor to Dismiss the Complaint under Federal Rules of Civil Procedure 9(b) and 12(b)(6). For the reasons stated below, the Motion is granted in part and denied in part.

### Facts [1]

Plaintiff Fujisawa Pharmaceutical Co., Ltd. ("Fujisawa") is a Japanese corporation in the business of manufacturing and selling pharmaceutical products in the international market. (Compl. ¶ 4.) Plaintiff Fujisawa USA, Inc. ("FUSA") is a Delaware corporation and a wholly-owned subsidiary of Fujisawa as well as the successor by merger to Lyphomed, Inc. (*Id.* ¶ 5.) Lyphomed was acquired on April 5, 1990, and merged into FUSA. *Id.* When FUSA acquired Lyphomed in 1990, Lyphomed was a leading producer of generic injectable drugs. *Id.*

Defendant John N. Kapoor is an Illinois resident who holds a Ph.D. in Medicinal Chemistry from the State University of New York. (*Id.* ¶ 13.) Between 1978 and April 1990, Kapoor served in a variety of positions with Lyphomed including sitting on the Board of Directors and serving as Vice President, General Manager, President, Chairman of the Board and CEO. (*Id.* ¶ 6.) Kapoor also held more than ten percent of the outstanding stock in Lyphomed. (*Id.* ¶ 6.)

### I. *Lyphomed Under Kapoor*

While Kapoor was associated with Lyphomed, he controlled the affairs of the company. (*Id.* ¶ 7.) In 1981, a group headed by

---

**1.** Because we are required to accept the facts as plead as true, we look to the plaintiff's complaint as the source of our narrative.

Kapoor purchased Lyphomed in a leveraged buy out for approximately $2,000,000.00, and in 1983 Lyphomed was taken public. (*Id.* ¶ 9.) Under Kapoor's leadership, Lyphomed manufactured both proprietary and generic[2] drugs. (*Id.* ¶ 17.) In order to gain FDA approval to market a generic drug, the manufacturer must file a Abbreviated New Drug Application ("ANDA") with the FDA. The ANDA must contain test results that demonstrate that the proposed generic drug is the bioequivalent of the patented drug it imitates and that it has the same stability. (*Id.* ¶ 18.)

In the competitive pharmaceutical business, the ability to be the first to produce a generic equivalent of a proprietary drug 'coming off patent' is a significant advantage. Lyphomed recognized this, and in its annual report for 1984 touted its "ability to successfully complete products and bring them to the marketplace in record time." (*Id.* ¶ 22.) In its Form 10–K's for 1985 and 1986, which were signed by Kapoor, Lyphomed noted that its ability to select the right products to produce generically and to "submit well prepared [sic] ANDAs in a timely manner . . . ." *Id.*

Beginning in 1980 and continuing through 1986, Lyphomed and Kapoor filed false applications and information with the Food and Drug Administration ("FDA") in connection with Lyphomed applications for FDA approval of new generic drugs. (*Id.* ¶ 8.) Kapoor imposed a quota system that required Lyphomed's generic research department to submit a number of ANDA's each month. (*Id.* ¶ 23.) In the rush to get FDA approval for their generic products, Lyphomed and Kapoor submitted false data on certain ANDA's. Further, Kapoor ordered that normalized data[3] be secretly included in certain ANDA's despite the fact that the FDA required that the use of that type of data be disclosed. Finally, with Kapoor's knowledge, Lyphomed failed to disclose adverse test results and failed to record, or destroyed the

results of, certain tests in violation of the FDA's ANDA regulations. (*Id.* ¶ 26.)

## II. *Fujisawa's Purchase of Lyphomed*

In March 1983, Lyphomed filed an initial public offering with the Securities and Exchange Commission ("SEC"). This filing contained nothing about Lyphomed's false ANDAs or the penalties that could result from those practices. (*Id.* ¶ 27.) From 1984 to 1990, Kapoor courted the Plaintiffs, hoping to induce them to purchase outstanding stock in Lyphomed. (*Id.* ¶ 10.) Pursuant to an agreement dated December 3, 1984, Fujisawa purchased 450,000 shares from Lyphomed and 320,000 shares from Kapoor. (*Id.* ¶ 28.) In the 1984 stock purchase agreement, Kapoor individually warranted that the balance sheets of Lyphomed did not contain any misstatements of material fact and did not omit any material fact necessary to make any statements not misleading. (*Id.* ¶ 29.) No information was disclosed concerning the ANDAs containing false information. *Id.*

Fujisawa reviewed the 1983, 1984 and 1985 Form 10–Ks filed by Lyphomed and signed by Kapoor. None of these documents mentioned the ANDAs containing false data. However, each did state that "[t]he Company is not aware of any current or pending proceedings before the FDA the outcome of which might materially adversely affect the Company's business or operations." (*Id.* ¶ 30.)

Fujisawa continued to purchase additional shares from Lyphomed and Kapoor in several transactions. By March 1988, Fujisawa owned twenty-eight percent of Lyphomed, but had no knowledge of the potential repercussions of the false data submitted in the ANDAs. (*Id.* ¶ 33.) In 1987 and 1988, the FDA raised concerns about Lyphomed's manufacturing procedures, but Fujisawa and other stockholders were reassured in a letter from Kapoor attached to the 1987 Form 10–K. The letter said that "[o]ur quality record

---

2. A proprietary drug is a pioneer drug that meets the requirements for patent protection. A generic drug, which can be marketed when the patent on a proprietary drug expires, contains the same active ingredients as a proprietary drug. (Compl. ¶¶ 17–18.)

3. Normalizing is the process of assuming that a drug's potency is 100% for purposes of measuring its degrading over time although the actual potency at the start of the test is, in fact, higher or lower than 100% (Compl. ¶ 25.)

and relationship with the FDA has been virtually unblemished in my 10–year history, and resolution of these quality issues will be a top management priority in 1988." (*Id.* ¶ 34.) No mention of the ANDAs containing false data was made.

In a letter attached to the 1988 annual report with the Form 10–K for that year, Kapoor and another Lyphomed officer indicated that Lyphomed has reacted to the FDA's concerns in a responsible manner:

> Procedures have been examined thoroughly to reverify that each product's documentation is a complete and accurate record of the manufacturing process. An independent audit team with outstanding credentials was commissioned to ensure consistency of these procedures.

(*Id.* ¶ 35.) No mention of the ANDAs containing false information was made.

Beginning in 1988, Kapoor attempted to convince Fujisawa to acquire Lyphomed, asserting that he was intimately familiar with every aspect of the business. Though Fujisawa initially declined, Kapoor was persistent. (*Id.* ¶ 37.) In August of 1989, based on its discussions with Kapoor and Lyphomed's SEC filings, Annual Reports and other documents, FUSA made a tender offer for Lyphomed and finally merged Lyphomed into FUSA on April 6, 1990. In the process, Fujisawa paid approximately $800,000,000.00 for Lyphomed, (*Id.* ¶ 11), $150,000,000.00 of which was to Kapoor for his shares.

## III. *Trouble with the FDA*

The FDA promulgates strict rules concerning tests taken for ANDA purposes, and is empowered to penalize non-complying manufacturers in a variety of ways, including required recalls. (Compl. ¶ 19.) Lyphomed documents demonstrate that Kapoor was aware of these requirements and the penalties for non-compliance. (*Id.* ¶ 20.)

In November 1991, the FDA informed FUSA that it had found "false or misleading information," including normalized data, incomplete or incorrect data, and unreported adverse test results as well as indications of destroyed or unrecorded results, in 12 ANDA filings submitted by Lyphomed between 1980 and 1986. (*Id.* ¶ 45.) In response, FUSA commenced an internal audit which confirmed the FDA's allegations, *id.*, and as a result has withdrawn or will withdraw several specified products from the market. (*Id.* ¶ 46.) Further, and perhaps even more serious, FUSA has been placed on the FDA Alert List. Being on the List has rather unpleasant consequences, including: (1) the FDA will not process or approve any New Drug Applications; (2) the FDA will not process or approve any ANDAs; (3) FUSA is disqualified from doing business with the federal government; (4) the FDA will not inspect or approve FUSA's new manufacturing facilities; and (5) FUSA may not sell its products in certain foreign countries. (*Id.* ¶ 48.)

Fujisawa and FUSA have filed a ten-count Complaint seeking nearly $1,000,000,000.00 in damages. Counts I–III allege violation of the following securities laws and regulations: (1) 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.-10b–5; (2) Section 18 of the Exchange Act, 15 U.S.C. § 78r; and (3) Section 12(2) of the Securities Act, 15 U.S.C. § 77*l* (2). Counts IV–VI allege the following RICO violations: (1) 18 U.S.C. § 1962(c); (2) 1962(a); and (3) 1962(b). Counts VII–X are based on the following state common law theories: (1) Constructive trust; (2) Fraud; (3) Breach of fiduciary duties; and (4) Breach of Warranty.

## *Discussion*

On a motion to dismiss, the court views the allegations of the complaint as true, along with reasonable inferences therefrom, and views these in the light most favorable to the plaintiff. *Powe v. City of Chicago*, 664 F.2d 639, 642 (7th Cir.1981). The plaintiffs' complaint should not be dismissed unless it appears beyond doubt that the plaintiffs are unable to prove any set of facts which would entitle them to relief. Nevertheless, the plaintiffs must allege sufficient facts to outline the cause of action, proof of which is essential to recovery. *Ellsworth v. City of Racine*, 774 F.2d 182, 184 (7th Cir.1985), *cert. denied*, 475 U.S. 1047, 106 S.Ct. 1265, 89 L.Ed.2d 574 (1986) (citations omitted).

## I. The Securities Fraud Counts

Kapoor attacks the securities fraud counts of Fujisawa's Complaint on several grounds. We address each of them separately.

### A. Rule 9(b)

■ A major underpinning of Kapoor's [4] motion is that the Complaint fails to meet the requirements of Rule 9(b).[5] Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). This means that the Complaint must state "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated...." *Schiffels v. Kemper Fin. Serv., Inc.*, 978 F.2d 344, 352 (7th Cir.1992) (*quoting Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir.1992)). Rule 9(b), however, must be read in conjunction with Rule 8, which requires a short and concise pleading. *Tomera v. Galt*, 511 F.2d 504, 508 (7th Cir. 1975); *Unytite, Inc. v. Lohr Structural Fasteners, Inc.*, No. 91 C 2849, 1992 WL 220918, at *2 (N.D.Ill. Sept. 1, 1992) (Plunkett, J.).

■ Read together, these Rules require that the time, place and contents of fraud be plead, but the complainant need not plead evidence. *Unytite, id.; Dynabest, Inc. v. Yao*, 760 F.Supp. 704, 707 (N.D.Ill.1991). Further, where fraud allegedly occurred over a period of time, the requirements of 9(b) are less stringently applied. *Unytite*, 1992 WL at *2; *In re Olympia Brewing Co. Sec. Litig.*, 674 F.Supp. 597 (N.D.Ill.1987). Rule 9(b) is not to be read blindly, but is to be applied in order to effectuate the purposes of the rule which are: (1) to inform the defendants of the claims against them and to enable them to form an adequate defense; (2) to eliminate the filing of a conclusory complaint as a pretext for using discovery to uncover wrongs; and (3) to protect defendants from unfounded charges of fraud which may injure their reputations. *Reshal Assoc., Inc. v. Long Grove Trading Co.*, 754 F.Supp. 1226, 1230 (N.D.Ill.1990) (citations omitted).

■ It is well established that Rule 9(b) governs claims based upon fraud made under federal securities laws. *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir.1990). The essence of Count I, based on Rule 10b–5,[6] is that Kapoor knowingly failed to disclose, in documents filed with the SEC, that inappropriate data was submitted to the FDA though he was aware of the potentially disastrous consequences for Lyphomed's generic drug business. Kapoor argues that the Complaint fails to state what misrepresentations or omissions were made, who made them or what Kapoor's involvement was in making any of the statements.

After a careful review of the arguments of the parties and the language of the Complaint, we feel that Count I adequately sets out the basic outline of fraud. Paragraph 54 states that:

> Kapoor, with intent to deceive and defraud FUSA, knowingly and recklessly made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made not misleading regarding the ANDAs containing false data filed with the FDA by Ly-

---

4. For purposes of simplicity and economy, the plaintiffs will be referred to jointly as "Fujisawa."

5. This argument is addressed to Counts I–VI, VIII and IX.

6. Rule 10b–5, which was promulgated under section 10(b) of the Securities Act, 15 U.S.C. § 78j(b), provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

> (a) To employ any device, scheme, or artifice to defraud,

> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

> (c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

phomed with Kapoor's knowledge, as more particularly set forth above. (Compl. ¶ 54(i).) This boilerplate, seen in nearly every 10b-5 complaint, is clearly insufficient on its own under Rule 9(b). However, paragraph 54 is augmented with ample references to specific dates, statements, documents and contents elsewhere. Paragraphs 30, 32, 34 and 35 of Fujisawa's Complaint set out specific documents that omitted, under Kapoor's signature, the fact that Lyphomed had, at Kapoor's direction or with his knowledge, submitted inappropriate data to the FDA on several ANDAs.[7]

Kapoor's vagueness argument centers on other matters, however. He asserts that because it is never specified what data from which ANDAs was noncomplying, Rule 9(b) mandates dismissal of the securities fraud counts. This argument misapprehends the nature of the Complaint and is unavailing. The gravamen of the Complaint is not submission of false data to the FDA; rather, it is Kapoor's acts of omission involved in concealing that conduct in order to artificially sustain or inflate the price of Lyphomed stock and/or to induce Fujisawa to acquire Lyphomed.[8]

■ This is a case involving misrepresentations and omissions of material facts. With respect to omissions, the plaintiff must plead the type of facts omitted, the type of document in which they should have appeared and the way in which their omission made the documents misleading. *Frymire v. Peat, Marwick, Mitchell & Co.*, 657 F.Supp. 889, 894 (N.D.Ill.1987). Fujisawa has clearly met that threshold. We therefore decline to dismiss Count I under Rule 9(b).

B. Loss Causation

■ Kapoor next attacks the securities fraud counts for failing to adequately plead loss causation. Loss causation, a requirement in a 10b-5 claim, is merely an exotic name for the tort concept of causation: the plaintiffs must show that, but for the defendant's wrongdoing, they would not have suffered the harm they complain of. *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 685 (7th Cir.), *cert. denied*, 496 U.S. 906, 110 S.Ct. 2590, 110 L.Ed.2d 270 (1990). In terms of security fraud, a plaintiff must allege that the loss would not have occurred if the facts were what he believed them to be. *LHLC Corp. v. Cluett, Peabody & Co.*, 842 F.2d 928, 931 (7th Cir.), *cert. denied*, 488 U.S. 926, 109 S.Ct. 311, 102 L.Ed.2d 329 (1988). In order to establish loss causation, a plaintiff must show that he would not have acted had he known the truth and also that the untruth was in some "reasonably direct or proximate way responsible for his loss." *Lewis v. Hermann*, 775 F.Supp. 1137, 1150 (N.D.Ill.1991) (citations omitted).

■ In *Bastian*, the Seventh Circuit found that loss causation was not present where the plaintiffs' investment in oil and gas limited partnerships could have been wiped out regardless of the fraud. *Bastian*, 892 F.2d at 684–85. As Kapoor's sole authority on loss causation, *Bastian* is a poor choice. The relationship between the plaintiffs' loss and the alleged fraud is much clearer in the present case. The Complaint alleges that Fujisawa would not have purchased Lyphomed had it known the truth about the Lyphomed's shoddy testing and the ANDA filings. (Compl. ¶ 58.) It can also be inferred from the Complaint that Fujisawa's loss, in the form of the FDA restrictions and recalls, is a direct result of Kapoor's fraudulent statements and omissions which artificially inflated the price of Lyphomed stock and induced Fujisawa to purchase the company. Therefore, we decline to dismiss Fujisawa's securities fraud claims for failure to allege loss causation. *See, e.g., Reshal Assoc., Inc. v. Long Grove Trading Co.*, 754 F.Supp. 1226, 1234–35 (N.D.Ill.1990).

---

7. These documents include the 1984 sales agreement, Form 10-Ks for 1983, 1984, and 1985 and the 1985 and 1987 Annual Reports.

8. We agree that references to Kapoor's orders to normalize "certain data," (Compl. ¶ 25), and submission of "certain specified ANDAs" to the FDA, (*see* Mem. in Opp. at 5), are vague. However, this information is underlying detail more appropriately plead at the evidentiary stage of this proceeding and is irrelevant to our inquiry here. Because Fujisawa now owns Lyphomed, we assume that this evidence is all readily available to them and can be provided upon demand.

## C. Scienter

 Kapoor further argues that the Complaint fails to allege scienter because it fails to state that Kapoor had an active part in any fraud. Scienter is a necessary allegation of a 10b–5 claim. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). However, Rule 9(b) provides that questions of intent may be averred generally, Fed.R.Civ.P. 9(b), and the scienter requirement may be satisfied by pleading reckless conduct. *Reshal,* 754 F.Supp. at 1235 (citations omitted). Despite the liberal pleading standard, however, the complaint must allege some factual basis for allegations of scienter. *Id.*

 In the present case, a strong factual basis for intent has been plead. Fujisawa alleges that Kapoor knew and approved of the conduct which has resulted in the current trouble with the FDA and that he failed to disclose the information to potential investors. It also alleges that Kapoor directed his researchers to secretly include normalized data in violation of FDA regulations and that he made statements which were materially misleading concerning Lyphomed's research procedures and its relationship with the FDA. This is a sufficient factual basis for this stage of the proceeding. Further, Kapoor had a clear motive to commit the fraud: from the purchase of Lyphomed by FUSA, he personally gained approximately $150,000,000.00 Motive and opportunity to commit the charged fraud will give rise to a strong inference of scienter. *Renovitch v. Kaufman,* 905 F.2d 1040, 1046 (7th Cir.1990); *Reshal,* 754 F.Supp. at 1226 (*citing WAIT Radio v. Price Waterhouse,* 691 F.Supp. 102, 106 (N.D.Ill.1988)). Therefore, we decline to dismiss the 10b–5 count for lack of scienter.

## D. Does 12(2) Apply to Transactions in the Secondary Market?

 Kapoor next asserts that Count II must be dismissed because section 12(2) of the Securities Act[9] applies only to initial offerings and does not apply to transactions, such as the one at issue, in the secondary market. This is a heavily litigated issue that has been discussed in dozens of district court opinions. Indeed, the great weight of authority seems to support Kapoor's position. *See Ballay v. Legg Mason Wood Walker, Inc.,* 925 F.2d 682, 687–91 (3rd Cir.) (express language and intent of Congress leads to finding that 12(2) applies only to initial offerings), *cert. denied,* —— U.S. ——, 112 S.Ct. 79, 116 L.Ed.2d 52 (1991); *Pacific Dunlop Holdings, Inc. v. Allen & Co.,* No. 90 C 5678, 1991 WL 348493 (N.D.Ill. May 16, 1991) (Zagel, J.) (adopting the holding of *Ballay*).[10] *See also Bennett v. Bally Mfg. Corp.,* 785 F.Supp. 559, 561–62 (D.S.C.1992) (following *Ballay*); *Budget Rent A Car Sys., Inc. v. Soloman, Gerson, Preston & Company, P.A.,* 810 F.Supp. 1253, (S.D.Fla.1992) (Highsmith, J.) (adopting majority rule); *Newman v. Comprehensive Care Corp.,* 794 F.Supp. 1513, 1524–25 (D.Or.1992); *Bank of Denver v. Southeastern Capital Group, Inc.,* 763 F.Supp. 1552, 1559 (D.Colo.1991); *T. Rowe Price New Horizons Fund, Inc. v. Preletz,*

---

**9.** Section 12(2) is codified at 15 U.S.C. § 77l(2), which states: Any person who—

> (2) offers or sells a security (whether or not exempted by the provisions of § 77(c) of this title other than paragraph (2) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known of such untruth or omission, shall be liable to the person

> purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

15 U.S.C. § 77l(2).

**10.** In *Pacific Dunlop,* the only Northern District of Illinois case on this question we have found, Judge Zagel adopts the *Ballay* holding without analysis. *Pacific Dunlop* was appealed and was argued before the Seventh Circuit on September 11, 1992, but a decision has not been issued as of this writing.

749 F.Supp. 705, 707–09 (D.Md.1990); *Grinsell v. Kidder, Peabody & Co.*, 744 F.Supp. 931, 932–34 (N.D.Cal.1990); *Leonard v. Stuart–James Co.*, 742 F.Supp. 653, 658 (N.D.Ga.1990); *Panek v. Bogucz*, 718 F.Supp. 1228, 1232 (D.N.J.1989) (12(2) applies only to initial offerings); *Mix v. E.F. Hutton & Co.*, 720 F.Supp. 8, 10–12 (D.D.C. 1989); *First Union Brokerage v. Milos*, 717 F.Supp. 1519, 1522–23 (S.D.Fla.1989); *McCowan v. Dean Witter Reynolds, Inc.*, Fed.Sec.L.Rep. (CCH) ¶ 94,423, 92,726–27, 1989 WL 38354 (S.D.N.Y. Apr. 11, 1989), *appeal dismissed*, 889 F.2d 451 (2d Cir.1989); *Cheltenham Bank v. Drexel Burnham Lambert, Inc.*, Fed.Sec.L.Rep. (CCH) ¶ 94,391, 92,542, 1989 WL 80279 (E.D.N.C. Mar. 15, 1989); *Strong v. Paine Webber, Inc.*, 700 F.Supp. 4, 5 (S.D.N.Y.1988); *Ralph v. Prudential–Bache Sec. Inc.*, 692 F.Supp. 1322, 1323–24 (S.D.Fla.1988); *Leonard v. Shearson Lehman/Am. Express, Inc.*, 687 F.Supp. 177, 179–80 (E.D.Pa.1988); *SSH Co. v. Shearson Lehman Bros., Inc.*, 678 F.Supp. 1055, 1059 (S.D.N.Y.1987); *Ackerman v. Clinical Data, Inc.*, Fed.Sec.L.Rep. (CCH) ¶ 92,207, 91,568, 1985 WL 1884 (S.D.N.Y. July 8, 1985); *Klein v. Computer Devices, Inc.*, 591 F.Supp. 270, 277–78 (S.D.N.Y.1984), *modified*, 602 F.Supp. 837 (S.D.N.Y.1985); *Gross v. Diversified Mortgage Investors*, 431 F.Supp. 1080, 1095 (S.D.N.Y.1977) (12(2) applies only to initial offerings), *aff'd without op.*, 636 F.2d 1201 (2d Cir.1980).

A handful of courts have taken the antithetic position. *See Farley v. Baird, Patrick & Co.*, 750 F.Supp. 1209 (S.D.N.Y.1990) (12(2) applies to secondary market transactions); *In re Ramtek Sec. Litig.*, Fed.Sec.L.Rep. (CCH) ¶ 95,483, 97,520–21, 1990 WL 157391 (N.D.Cal. Sept. 7, 1990); *In re Consol. Capital Sec. Litig.*, No. C–85–7332–AJZ, 1990 WL 82383 (N.D.Cal. Feb. 28, 1990); *Elysian Fed. Sav. Bank v. First Interregional Equity Corp.*, 713 F.Supp. 737, 751 (D.N.J.1989) (overruled by *Ballay*); *Wilko v. Swan*, 127 F.Supp. 55 (S.D.N.Y.1955) (12(2) applies to secondary offerings as well). *See also Diamond v. Fogelman*, Fed.Sec.L.Rep. (CCH) ¶ 96,873 (E.D.N.Y. June 24, 1992) (noting split among New York federal courts).

Fujisawa suggests that we follow the reasoning of the minority and allow them to sue under section 12(2). Specifically, the Plaintiffs cite the *Farley* opinion because it relies on Judge Easterbrook's dicta in *Short v. Belleville Shoe Mfg. Co.*, 908 F.2d 1385, 1390 (7th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991), that suggests that the scope of 12(2) is broader than just initial offerings:

> Section 11 deals with errors and omissions in registration statements, including the portion of the registration statement that circulates as the prospectus. Section 12(1) deals with sales "in violation of section 5"—that is, unregistered sales of securities required to be registered. Section 12(2) addresses all other forms of materially incorrect or misleading selling literature and oral communication in the sale of a security.

*Short*, 908 F.2d at 1390 (emphasis added).

There is yet a third alternative, and it is one we find particularly well-reasoned. In their Brief, Fujisawa argues that the transaction at issue was, in essence, an initial offering and that the same concerns arose even though it was technically a secondary transaction. (Br. in Opp. at 11.)

Though the Plaintiffs cite no authority for this proposition, treating the sale of securities in the secondary market by a corporate insider who exercises control over the corporation as an initial sale for purposes of section 12(2) has a basis in the legislative history of the 1933 Act. The House Report accompanying the Act stated that it was intended to "affect only new offerings of securities ... [and] does not affect the ordinary redistribution of securities unless such redistribution takes on the characteristics of a new offering by reason of the control of the issuer possessed by those responsible for the offering." H.R.Rep. No. 85, 73rd Cong., 1st Sess., 5. Another section of the report elaborates on this concern:

> All the outstanding stock of a particular corporation may be owned by one individual or a select group of individuals. At some future date they may wish to dispose of their holdings and to make an offer of this stock to the public. Such a public

offering may possess all the dangers attendant upon a new offering of securities. Whenever such a redistribution reaches significant proportions, the distributor would be in the position of controlling the issuer and thus able to furnish the information demanded by the bill. This being so, the distributor is treated as equivalent to the original issuer, and, if he seeks to dispose of the issue through a public offering, he becomes subject to the act. The concept of control herein involved is not a narrow one, depending upon a mathematical formula of 51 percent voting power, but is broadly defined to permit the provisions of the act to become effective wherever the fact of control actually exists.

*Id.* at 13–14.

This bifurcated analysis also finds support in the more recent District Court opinions discussing this issue. While accepting the reasoning of the majority that, as a general matter, section 12(2) does not apply to secondary transactions, the court in *Hedden v. Marinelli,* 796 F.Supp. 432 (N.D.Cal.1992) (Peckham, J.) held that a sale of stock by a corporate insider with control of the corporation may be an exceptional case that warrants application of section 12(2). *Id.* at 435–36. Other courts have also recognized that such an analysis may be appropriate. *See, e.g., Newman v. Comprehensive Care Corp.,* 794 F.Supp. 1513, 1525 (D.Or.1992) (recognizing that a secondary transaction may take on the characteristics of an initial offering).

In *Budget Rent A Car Systems, Inc. v. Hirsch, Solomon and Gerson, Preston & Company, P.A.,* 810 F.Supp. 1253 (S.D.Fla. 1992) (Highsmith, J.), the court found that implicit in the *Hedden* exception to the majority rule is a three-factor test: 1) the stock must be distributed through a controlling distributor; 2) all of the outstanding stock of the corporation must be put up for sale; and 3) the stock must be offered to the public. *Id.* at 1257. Though the record does not yet allow us to decide the validity of this analysis or the applicability of these factors to the present case, this question is worthy of further analysis.

Given the persuasiveness of the *Hedden* analysis and the tone of Judge Easterbrook's dicta in *Short,* we cannot hold that, as a matter of law, Fujisawa may not proceed on their section 12(2) complaint. We hold that, as a general rule, section 12(2) applies only to initial offerings of securities. However, where, as here, the seller of stock was a corporate insider who exercised control over the affairs of the corporation and had access to inside information regarding the company, the buyer is not necessarily barred from pursuing a section 12(2) claim. *See Hedden* 796 F.Supp. at 436. This limited exception to the majority rule leaves the more stringent scienter requirements of Rule 10b–5 intact for all but a small number of plaintiffs.

It is unclear that the *Hedden* exception applies in the present case: the transaction at issue took place after Fujisawa had already acquired 28 percent of Lyphomed. However, at this stage of the proceeding, we are unwilling to discard the possibility: this issue would be more properly resolved in a motion for summary judgment. Therefore, Kapoor's motion to dismiss Count II is denied.

### E. Section 18 of the Exchange Act [11]

Count III alleges a violation of section 18 of the Exchange Act, which addresses mis-

---

11. Section 18, 15 U.S.C. § 78(r)(a) states:

(a) **Persons liable; persons entitled to recover; defense of good faith; suit at law or in equity; costs, etc.** Any person who shall make or cause to be made any statement in any application, report, or document filed pursuant to this chapter or any rule or regulation thereunder or any undertaking contained in a registration statement as provided in subsection (d) of section 78*o* of this title, which statement was at the time and in the light of the circumstances under which it was made false or misleading with respect to any material fact, shall be liable to any person (not knowing that such statement was false or misleading) who, in reliance upon such statement, shall have purchased or sold a security at a price which was affected by such statement, for damages caused by such reliance, unless the person sued shall prove that he acted in good faith and had no knowledge that such statement was false or misleading. A person seeking to enforce such liability may sue at law or in equity in any court of competent jurisdiction. In any such suit the court may, in its discretion, require an undertaking for the payment of the

representations in documents submitted to the SEC. Kapoor argues that Count III must be dismissed because section 18 does not reach annual reports, the documents Fujisawa claims were fraudulent. However, this misapprehends the claim of Count III which refers to annual reports *on* Form 10–K and Quarterly Reports *on* Form 10–Q, (Compl. ¶ 67), and we may answer this dispute with dispatch. Form 10–K, filed annually with the SEC is essentially an annual report itself and the regulations specifically state:

> An Annual Report to security holders prepared on an integrated basis pursuant to General Instruction H to Form 10–K (§ 249.310) may also be submitted in satisfaction of this rule. *When filed as the annual report on Form 10–K, responses to the Items of that form are subject to section 18 of the Act notwithstanding paragraph (c) of this section.*

17 C.F.R. § 240.14–a–3(d) (emphasis added).

██ In light of this clarification of the Complaint, Kapoor mutes his argument concerning the Form 10–Ks. However, he points out that only general references to misrepresentations on quarterly reports on Form 10–Q are made, and that such references fail to meet the requirements of Rule 9(b). (Compl. ¶ 67.) We agree with Kapoor on this issue. Count III, to the extent it relies on misrepresentations in specified Form 10–Ks is sufficiently plead. However, references in Count III to misrepresentations on Quarterly Reports on Form 10–Q are stricken. Fed.R.Civ.P. 9(b).

## II. *The RICO Claims* [12]

Kapoor attacks Counts IV–VI, the RICO claims, as insufficient as a matter of law. He asserts that the Complaint fails to plead the predicate acts with the required specificity and that it fails to adequately plead a pattern of racketeering activity. Further, as to

Counts V and VI, he alleges that because they fail to allege an injury by the use of income or the acquisition or control of an enterprise, they must be dismissed.

### A. The RICO Counts and Rule 9(b)

██ It is clear that the requirements of Rule 9(b) apply to RICO claims based upon fraud. *Midwest Grinding Co., Inc. v. Spitz,* 976 F.2d 1016, 1020 (7th Cir.1992) (citations omitted). However, the liberal notice pleading philosophy of the Federal Rules applies as well. *Pandick, Inc. v. Rooney,* 632 F.Supp. 1430, 1436 (N.D.Ill.1986). Thus, the plaintiffs need only provide an outline of the fraudulent scheme with enough specificity to reasonably notify the defendant of his alleged role: the complaint must allege the time, place and content of the alleged communications perpetrating the fraud. *Midwest Grinding,* 976 F.2d at 1020.

██ Fujisawa alleges violations of the mail and wire fraud statutes as predicate acts for the RICO claims in their Complaint. *See* 18 U.S.C. § 1962(c); 18 U.S.C. § 1341 (mail fraud); 18 U.S.C. § 1343 (wire fraud). These types of allegations must be plead with specificity, and loose references to mailings and telephone calls are not sufficient. *R.E. Davis Chem. Corp.,* 757 F.Supp. 1499, 1516.

██ As we have already found that the Complaint meets the requirements of 9(b) for purposes of securities fraud, we need pause here but briefly. Fujisawa has alleged that Kapoor, in several specified annual reports mailed to shareholders and other documents, misrepresented the status of Lyphomed's ANDA submissions and the quality of its research and thus, its prospective future as a maker of generic drugs. These documents include the 1984 sales agreement, Lyphomed Form 10–Ks for 1983, 1984, 1985 and 1986 filed with the SEC and the 1984–1988 Annual Reports mailed to shareholders. (*See, e.g.,*

---

costs of such suit, and assess reasonable costs, including reasonable attorneys' fees, against either party litigant.
15 U.S.C. § 78r(a).

**12.** Kapoor has attacked the RICO Counts on many grounds. We have decided to address all these grounds for dismissal, even though such a

thorough review is no longer necessary once dismissal is granted on any ground. We do so in light of the Plaintiff's right to file an amended complaint. Fed.R.Civ.P. 15(a). *See R.E. Davis Chem. Corp. v. Nalco Chem. Co.,* 757 F.Supp. 1499, 1509 n. 12 (N.D.Ill.1990) (citations omitted).

Compl. ¶¶ 22, 30, 32, 34, 35.) For example, the 1988 Annual Report stated that, in response to an FDA investigation, Lyphomed had reverified the documentation of its research to insure the correctness of the procedure.

■ We cannot hold that the Complaint fails to put Kapoor on notice of the outlines *of the alleged predicate acts and of his role in them, at least as concerns mail fraud.* It pleads that specified mailings contained false or misleading statements made by Kapoor about Lyphomed. However, the Complaint is not nearly so forthright about any alleged wire fraud. Though the Complaint alleges that phone calls and telecopier transmissions of various documents were used by Kapoor to perpetuate the alleged fraud, (Compl. ¶ 75), no further detail is provided. Such general allegations, lacking in any factual foundation, fall far short of the requirements of Rule 9(b).

■ Thus, we find that the RICO Counts adequately plead acts of mail fraud as predicate acts, and to the extent Counts IV–VI rely on mail fraud, they are adequately specific. However, with respect to wire fraud, no underlying detail is given; only general accusations are made. This is clearly inadequate, and the references in the RICO counts to violations of the wire fraud statute as predicate acts are stricken. (Compl. ¶¶ 75, 75(b).)

### B. Count IV: 18 U.S.C. § 1962(c)[13]— Pattern of Racketeering Activity[14]

Kapoor further argues that because the predicate acts of mail and wire fraud are fatally deficient, this Court cannot determine if the RICO Counts adequately plead a pattern of racketeering activity. Fujisawa responds that specified of acts mail fraud, insider trading and misrepresentation over a

six-year period of time are plead with adequately specificity. (Compl. ¶¶ 30, 32, 39, 75, 29, 55.) Kapoor's argument is simply a rehash of his specificity arguments, which we have largely rejected, and they do not persuade us here either. The alleged predicate acts, with the exception of wire fraud, are plead with adequate specificity. Thus, we are able to adequately address this issue.

Precisely what constitutes a "pattern of racketeering activity" is somewhat ill-defined: it has been compared to Justice Potter Stewart's now famous obscenity test—"I know it when I see it"—set forth in *Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964). *Morgan v. Bank of Waukegan*, 804 F.2d 970, 977 (7th Cir.1986) (*citing Papai v. Cremosnik*, 635 F.Supp. 1402, 1410 (N.D.Ill.1986)). The Supreme Court has recently held that courts should take a flexible approach to the pattern requirement: In RICO, Congress "envision[ed] a concept of sufficient breadth that it might encompass multiple predicates within a single scheme that were related and that amounted to, or threatened the likelihood of, continued criminal activity." *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 237, 109 S.Ct. 2893, 2899, 106 L.Ed.2d 195 (1989) (overturning rule in Eighth Circuit that any number of predicate acts concerning multiple victims over six years cannot constitute a RICO pattern if they relate to a single scheme). This confirmed earlier Seventh Circuit holdings that "the mere fact that the predicate acts relate to the same overall scheme or involve the same victim does not mean that the acts automatically fail to satisfy the pattern requirement." *Morgan*, 804 F.2d at 975–76; *Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1304 (7th Cir.1987), *cert. denied*, 492 U.S. 917, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989).

---

**13.** RICO Section 1962(c) provides that

[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....

18 U.S.C. § 1962(c).

**14.** Though Kapoor has only tangentially raised this argument, it is the duty of the district court to carefully scrutinize the allegations of the complaint to determine whether they state a claim. *Jones v. Lampe*, 845 F.2d 755, 757 (7th Cir.1988). Though we must accept the allegations as true, we need not close our eyes to the contents of those allegations. *Id.*

■ In order to establish a pattern, the plaintiff must plead two elements: "It is this factor of *continuity plus relationship* which combines to produce a pattern." *H.J., Inc.,* 492 U.S. at 239, 109 S.Ct. at 2900 (citation omitted) (emphasis added); *Schiffels v. Kemper Fin. Serv.,* 978 F.2d 344, 353 (7th Cir. 1992); *Sutherland v. O'Malley,* 882 F.2d 1196, 1203 (7th Cir.1989) (recognizing *H.J., Inc.* as an affirmation of Seventh Circuit RICO jurisprudence). Thus, in order to establish a pattern, the plaintiff must plead that the racketeering predicates are related *and* that they amount to or pose a threat of continued criminal conduct. *H.J., Inc.,* 492 U.S. at 239, 109 S.Ct. at 2900.

The relatedness prong of the pattern test is the more clearly defined of the two, and appears to have been met by Fujisawa. The relationship test is satisfied when the alleged predicate acts "are said to be related by a common purpose." *H.J., Inc.,* 492 U.S. at 250, 109 S.Ct. at 2906. Certainly, the predicate acts plead in the present case all relate to concealing the ANDA fraud and/or inducing Fujisawa to purchase Lyphomed stock.

■ The continuity prong of the analysis is the more troublesome of the two. The Seventh Circuit has set out a test for assessing whether conduct alleged in the Complaint constitutes a continuing pattern of racketeering activity. *See Sutherland,* 882 F.2d at 1204; *Jones v. Lampe,* 845 F.2d 755, 756–57 & n. 4 (7th Cir.1988). Whether sufficient continuity exists is a fact-specific question encompassing many relevant factors including: (1) the number and variety of predicate acts and the length of time over which they were committed; (2) the number of victims; (3) the presence of several schemes; and (4) the occurrence of distinct injuries. *Id.* at 757; *Triad Assoc., Inc. v. Chicago Housing Auth.,* 892 F.2d 583, 594 (7th Cir.1989), *cert. denied,* 498 U.S. 845, 111 S.Ct. 129, 112 L.Ed.2d 97 (1990).

Though none of these factors standing alone is dispositive, it is well-established in this circuit that "multiple acts of mail fraud in furtherance of a single episode of fraud involving one victim and relating to one basic transaction cannot constitute the necessary pattern." *Jones, id.* (*quoting Tellis v. U.S. Fidelity & Guarantee Co.,* 826 F.2d 477, 478 (7th Cir.1986); *accord Talbot v. Robert Matthews Distrib. Co.,* 961 F.2d 654, 663 (7th Cir.1992) (multiple acts of mail fraud extending over several years were in furtherance of single scheme and resulted in non-distinct injuries).[15]

■ However, in congruence with the Supreme Court's ruling in *H.J., Inc.,* there is a narrow exception to this rule. In certain circumstances, a single scheme to injure a single victim may constitute a pattern of racketeering activity. Where the particular predicate acts represent distinct, repeated injuries inflicted on the plaintiff, relatedness and continuity may be present. *See H.J., Inc.,* 492 U.S. at 242, 109 S.Ct. at 2902 ("A party may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time."); *Liquid Air Corp. v. Rogers,* 834 F.2d 1297, 1304–05 (7th Cir.1987) (each act of fraud was a separate economic deprivation to plaintiff); *Appley v. West,* 832 F.2d 1021 (7th Cir.1987) (each act of fraud was a

---

15. Indeed, this rule is firmly entrenched in Seventh Circuit case law. *See, e.g., New Burnham Prairie Homes, Inc. v. Village of Burnham,* 910 F.2d 1474, 1478–79 (7th Cir.1990); *Skycom Corp. v. Telstar Corp.,* 813 F.2d 810, 818 (7th Cir.1987) (no pattern where allegedly fraudulent representations led up to a single contract and the transfer of a single business opportunity); *Tellis,* 826 F.2d at 479–80 (no pattern where multiple predicate acts all clearly relate to same transaction involving a single victim and a single injury); *Marks v. Pannell Kerr Forster,* 811 F.2d 1108, 1112 (7th Cir.1987) (no pattern where multiple predicate acts related to a single scheme in a "one-shot" effort to inflict a single injury) *J.D. Marshall, Int'l v. Redstart, Inc.,* 935 F.2d 815, 820 (7th Cir.1991) (single scheme, single victim, single transaction); *Sutherland,* 882 F.2d at 1204–05 (same); *Medical Emerg. Serv. Assoc. v. Foulke,* 844 F.2d 391, 394–98 (7th Cir.1988) (same); *Elliott v. Chicago Motor Club Ins.,* 809 F.2d 347, 350 (7th Cir.1986) (no pattern where multiple acts of alleged mail fraud over a period of several years all related to one scheme to defraud the plaintiffs under a single insurance policy); *Lipin Enter., Inc. v. Lee,* 803 F.2d 322, 324 (7th Cir.1986) (no pattern where multiple acts related to one scheme to induce plaintiff to purchase business for more than it was worth with no threat of continuing activity); *R.E. Davis,* 757 F.Supp. 1499, 1518–19.

separate deprivation); *Illinois Dep't of Revenue v. Phillips*, 771 F.2d 312 (7th Cir.1985) (nine mailings of fraudulent tax returns was a pattern because each resulted in a separate underpayment). *But see SK Hand Tool Corp. v. Dresser Indus. Inc.*, 852 F.2d 936, 943 (7th Cir.1988), *cert. denied*, 492 U.S. 918, 109 S.Ct. 3241, 106 L.Ed.2d 589 (1989) (*Liquid Air* not applicable where each predicate act did not cause separate harm).

In *Liquid Air*, the defendant, who leased compressed air containers from the plaintiff, sent 19 false shipping orders to plaintiff indicating they had returned the cylinders when they had not. The Seventh Circuit held that each shipping order, plead as a predicate act, inflicted separate injury upon the plaintiff: "Each time an invoice was prepared, it deprived [the plaintiff] of its entitlement to rent or replacement value. Therefore, each act resulted in a distinct injury to [the plaintiff] and a concomitant benefit to [the defendant]." *Liquid Air*, 834 F.2d at 1304–05.

■■■ The test for the *Liquid Air* exception appears to be whether the plaintiff has suffered "repeated infliction of economic injury" over time. *Jones*, 845 F.2d at 759; *Liquid Air* at 1305. In the present case, it is clear that the predicate acts of mail fraud inflicted repeated and distinct economic injuries upon Fujisawa. Though the acts that constitute the gravamen of the Complaint all relate to a single scheme,[16] fraudulent acts to inflate the price of Lyphomed and to induce Fujisawa to purchase it, and involved only a single victim, Fujisawa, they resulted in repeated economic injury to the plaintiff. In reliance upon Kapoor's specific misrepresentations, Fujisawa purchased large blocks of Lyphomed stock in several separate transactions, each of which inflicted a distinct economic injury to the plaintiff. (Compl. ¶¶ 28, 30, 31, 39–43.) *See Morgan*, 804 F.2d 970,

976 (several acts of mail fraud over several years were distinct transactions though they could be viewed as part of a single scheme).

■■■ Where, as here, multiple predicate act relating to a single scheme inflict repeated economic injury on an alleged victim over the course of several years, both relatedness and continuity are clearly present. We hold that Fujisawa has adequately plead a pattern of racketeering activity, and we decline to dismiss Count IV.

C. Counts V and VI: 18 U.S.C. § 1962(a) and 18 U.S.C. 1962(b)

■■■ In Counts V and VI, Fujisawa alleges that Kapoor, through use of the proceeds of racketeering activity, has acquired control of several other businesses. (Compl. ¶¶ 79–84.) Kapoor moves to dismiss both of these counts.

Kapoor argues that Count V must be dismissed because Fujisawa fails to plead injury from the use or investment of funds derived from racketeering activity as proscribed under section 1962(a).[17] The majority of circuit courts to address the issue has agreed, holding that allegations of injury from racketeering activity alone are insufficient to state a cause of action, and that injury from the use of racket-derived income is required under section 1962(a). *See, Ouaknine v. MacFarlane*, 897 F.2d 75, 82–83 (2nd Cir.1990) (collecting cases); *Rose v. Bartle*, 871 F.2d 331, 357–358 (3d Cir.1989); *Grider v. Texas Oil & Gas Corp.*, 868 F.2d 1147, 1149 (10th Cir.), *cert. denied*, 493 U.S. 820, 110 S.Ct. 76, 107 L.Ed.2d 43 (1989); *see also, Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296 (9th Cir.1990) (noting conflicting authorities without deciding issue), *cert. denied*, —— U.S. ——, 112 S.Ct. 332, 116 L.Ed.2d 272 (1991). *But See Busby v. Crown Supply, Inc.*, 896 F.2d 833,

16. The complaint alleges that: "During the period from 1984 through 1990, Kapoor, intending to defraud and deceive Plaintiffs, knowingly and recklessly misrepresented and failed to disclose to plaintiffs material facts regarding Lyphomed's filing of false data with the FDA in connection with certain drug applications made by Lyphomed with the knowledge of Kapoor." (Compl. ¶ 11.)

17. Section 1962(a) provides that:

It shall be unlawful for any person who has received any income derived, directly or indirectly from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in or the activities of which affect, interstate or foreign commerce....

18 U.S.C. § 1962(a).

840 (4th Cir.1990) (rejecting the "income use" rule). The Seventh Circuit has yet to address the issue, and there is a split among the courts of this district. *Compare Weinstein v. Carrane*, No. 90 C 1190, 1992 WL 151551, at *2 (N.D.Ill. June 22, 1992) (Leinenweber, J.) (refusing argument based on *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), reversing earlier decision, and conforming to majority rule that allegations of predicate act injury are insufficient); *Lappin v. Mesirow Inv. Serv., Inc.*, No. 91 C 4374, 1992 WL 106776, at *1 (N.D.Ill. May 11, 1992) (Zagel, J.) (adopting Magistrate Judge's Report and Recommendation applying "income use" rule); *R.E. Davis Chem. Corp. v. Nalco Chem. Corp.*, 757 F.Supp. 1499, 1524–25 (N.D.Ill.1990) (Rovner, J.) (declining to abandon "income use" requirement); *Midwest Grinding Co., Inc. v. Spitz*, 716 F.Supp. 1087, 1090–91 (N.D.Ill.1989) (Rovner, J.) (to state a claim under section 1962(a), plaintiff must allege injury from use of income), *aff'd on other grounds*, 976 F.2d 1016 (7th Cir.1992); *Palumbo v. I.M. Simon & Co.*, 701 F.Supp. 1407, 1409–1410 (N.D.Ill.1988) (Bua, J.); *P.M.F. Serv., Inc. v. Grady*, 681 F.Supp. 549, 555 (N.D.Ill.1988) (Shadur, J.); *Heritage Ins. Co. v. First Nat'l Bank of Cicero*, 629 F.Supp. 1412, 1417 (N.D.Ill.1986) (Getzendanner, J.), *with, In re ContiCommodity Serv., Inc. Sec. Lit.*, 733 F.Supp. 1555, 1556 (N.D.Ill.1990) (Hart, J.) (rejecting "income use" requirement); *Mid–State Fertilizer Co. v. Exchange Nat'l Bank of Chicago*, 693 F.Supp. 666, 671 (N.D.Ill.1988) (Hart, J.) (rejecting "income use" requirement), *judgment aff'd*, 877 F.2d 1333 (7th Cir.1989); *Continental Grain Co. v. Pullman Standard, Inc.*, 690 F.Supp. 628, 632–33 (N.D.Ill.1988) (Leinenweber, J.) (rejecting "income use" rule, but this position was later abandoned by Judge Leinenweber in *Lappin*); *Haroco, Inc. v. American Nat'l Bank and Trust Co.*, 647

F.Supp. 1026, 1032–33 (N.D.Ill.1986) (Decker, J.).

The weight of authority and the plain language of the RICO statute support Kapoor on this issue: Section 1964(c) authorizes a private cause of action for "any person injured ... by reason of a violation of section 1962." 18 U.S.C. § 1964(c). Section 1962(a) prohibits the investment of racketeering income to establish or operate an enterprise, not mere participation in acts of racketeering. 18 U.S.C. § 1962(a). In the past, we have twice joined the majority in holding that allegations of injury from predicate acts alone are insufficient to state a cause of action under section 1962(a). *See Illinois ex rel. Hartigan v. Flisk*, 702 F.Supp. 189, 192–93 (N.D.Ill.1988) (Plunkett, J.);[18] *Flood v. Waste Management, Inc.*, slip op., No. 87 C 4643, 1988 WL 87504 (N.D.Ill.1988) (Plunkett, J.). Today we do so for the third time, and hold that in order to state a claim under section 1962(a), the plaintiff must allege injury from the use or investment of income derived from racketeering activity. Kapoor's motion to dismiss Count V is granted.

The same can be said of a claim under section 1962(b).[19] In order to state a claim for relief for violation of 1962(b), the plaintiff must allege that he was injured by reason of the defendant's acquisition or control of an interstate enterprise, not merely by the predicate acts of racketeering activity. *Midwest Grinding*, 716 F.Supp. at 1091 (citations omitted). Fujisawa has not done so, and Count VI is dismissed.

### III. *The State Law Claims*

Kapoor's state law arguments all rest upon the assumption that the federal claims in the Complaint would be dismissed. Because we have left the vast majority of the complaint intact, including claims of fraud, we retain jurisdiction over the state law claims and decline to dismiss them.

---

**18.** We commend Fujisawa for citing our decision in *Flisk*, which is directly contrary to their position, even though Kapoor had apparently missed it in his research. Fujisawa's rigid honesty is far too rare these day, and it is duly noted by this Court.

**19.** RICO Section 1962(b) provides that:

[i]t shall be unlawful for any person through a pattern of racketeering activity ... to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(b).

## Conclusion

Therefore, Kapoor's Motion to Dismiss is granted in part and denied in part. Kapoor's Motion to Dismiss Counts I, II and VII–X is denied in its entirety. References in Count III concerning misrepresentations in various Form 10–Qs are stricken without prejudice, the remainder of the Count to stand. References in Count IV to wire fraud are stricken without prejudice, the remainder to stand. Kapoor's Motion to Dismiss Counts V and VI is granted and those counts are dismissed without prejudice.